(Slip Opinion)	OCTOBER TERM, 2017	1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MCCOY *v.* LOUISIANA

### CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 16–8255.   Argued January 17, 2018—Decided May 14, 2018

Petitioner Robert McCoy was charged with murdering his estranged wife's mother, stepfather, and son.  McCoy pleaded not guilty to first-degree murder, insisting that he was out of State at the time of the killings and that corrupt police killed the victims when a drug deal went wrong.  Although he vociferously insisted on his innocence and adamantly objected to any admission of guilt, the trial court permitted his counsel, Larry English, to tell the jury, during the trial's guilt phase, McCoy "committed [the] three murders."  English's strategy was to concede that McCoy committed the murders, but argue that McCoy's mental state prevented him from forming the specific intent necessary for a first-degree murder conviction.  Over McCoy's repeated objection, English told the jury McCoy was the killer and that English "took [the] burden off of [the prosecutor]" on that issue.  McCoy testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom.  The jury found him guilty of all three first-degree murder counts.  At the penalty phase, English again conceded McCoy's guilt, but urged mercy in view of McCoy's mental and emotional issues.  The jury returned three death verdicts.  Represented by new counsel, McCoy unsuccessfully sought a new trial.   The Louisiana Supreme Court affirmed the trial court's ruling that English had authority to concede guilt, despite McCoy's opposition.

*Held*: The Sixth Amendment guarantees a defendant the right to choose the objective of his defense and to insist that his counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty.  Pp. 5–13.

   (a) The Sixth Amendment guarantees to each criminal defendant "the Assistance of Counsel for his defence."  The defendant does not

surrender control entirely to counsel, for the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta* v. *California*, 422 U. S. 806, 819–820. The lawyer's province is trial management, but some decisions are reserved for the client—including whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. Autonomy to decide that the objective of the defense is to assert innocence belongs in this reserved-for-the-client category. Refusing to plead guilty in the face of overwhelming evidence against her, rejecting the assistance of counsel, and insisting on maintaining her innocence at the guilt phase of a capital trial are not strategic choices; they are decisions about what the defendant's objectives in fact *are*. See *Weaver* v. *Massachusetts*, 582 U. S. ___, ___. Counsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty, as English did here. But the client may not share that objective. He may wish to avoid, above all else, the opprobrium attending admission that he killed family members, or he may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration. See Tr. of Oral Arg. 21–22. Thus, when a client makes it plain that the objective of "his defence" is to maintain innocence of the charged criminal acts and pursue an acquittal, his lawyer must abide by that objective and may not override it by conceding guilt. Pp. 5–8.

(b) *Florida* v. *Nixon*, 543 U. S. 175, is not to the contrary. Nixon's attorney did not negate Nixon's autonomy by overriding Nixon's desired defense objective, for Nixon "was generally unresponsive" during discussions of trial strategy and "never verbally approved or protested" counsel's proposed approach. *Id.,* at 181. He complained about counsel's admission of his guilt only after trial. *Id.*, at 185. McCoy, in contrast, opposed English's assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court. Citing *Nix* v. *Whiteside*, 475 U. S. 157, the Louisiana Supreme Court concluded that English's refusal to maintain McCoy's innocence was necessitated by a Louisiana Rule of Professional Conduct that prohibits counsel from suborning perjury. But in *Nix*, the defendant told his lawyer that he intended to commit perjury. Here, there was no avowed perjury. English harbored no doubt that McCoy believed what he was saying; English simply disbelieved that account in view of the prosecution's evidence. Louisiana's ethical rules might have stopped English from presenting McCoy's alibi evidence if English knew perjury was involved, but Louisiana has identified no ethical rule requiring English to admit McCoy's guilt over McCoy's objection. Pp. 8–11.

(c) The Court's ineffective-assistance-of-counsel jurisprudence, see *Strickland* v. *Washington*, 466 U. S. 668, does not apply here, where the client's autonomy, not counsel's competence, is in issue. To gain redress for attorney error, a defendant ordinarily must show prejudice. See *id.,* at 692. But here, the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative. Violation of a defendant's Sixth Amendment-secured autonomy has been ranked "structural" error; when present, such an error is not subject to harmless-error review. See, *e.g., McKaskle* v. *Wiggins*, 465 U. S. 168, 177, n. 8; *United States* v. *Gonzalez-Lopez*, 548 U. S. 140; *Waller* v. *Georgia*, 467 U. S. 39. An error is structural if it is not designed to protect defendants from erroneous conviction, but instead protects some other interest, such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Weaver*, 582 U. S., at \_\_ (citing *Faretta*, 422 U. S., at 834). Counsel's admission of a client's guilt over the client's express objection is error structural in kind, for it blocks the defendant's right to make a fundamental choice about his own defense. See *Weaver*, 582 U. S., at \_\_\_. McCoy must therefore be accorded a new trial without any need first to show prejudice. Pp. 11–12.

2014–1449 (La. 10/19/16), 218 So. 3d 535, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion, in which THOMAS and GORSUCH, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–8255

_____

## ROBERT LEROY McCOY, PETITIONER *v.* LOUISIANA

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF LOUISIANA

[May 14, 2018]

JUSTICE GINSBURG delivered the opinion of the Court.

In *Florida* v. *Nixon*, 543 U. S. 175 (2004), this Court considered whether the Constitution bars defense counsel from conceding a capital defendant's guilt at trial "when [the] defendant, informed by counsel, neither consents nor objects," *id.,* at 178. In that case, defense counsel had several times explained to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive. *Id.,* at 186. We held that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, *id.,* at 181, "[no] blanket rule demand[s] the defendant's explicit consent" to implementation of that strategy, *id.,* at 192.

In the case now before us, in contrast to *Nixon*, the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt. App. 286–287, 505–506. Yet the trial court permitted counsel, at the guilt phase of a capital trial, to tell the jury the defendant "committed three murders. . . . [H]e's guilty." *Id.,* at 509, 510. We hold that a defendant has the right to insist that counsel refrain from admitting

guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Guaranteeing a defendant the right "to have the *Assistance* of Counsel for *his* defence," the Sixth Amendment so demands. With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.

I

On May 5, 2008, Christine and Willie Young and Gregory Colston were shot and killed in the Youngs' home in Bossier City, Louisiana. The three victims were the mother, stepfather, and son of Robert McCoy's estranged wife, Yolanda. Several days later, police arrested McCoy in Idaho. Extradited to Louisiana, McCoy was appointed counsel from the public defender's office. A Bossier Parish grand jury indicted McCoy on three counts of first-degree murder, and the prosecutor gave notice of intent to seek the death penalty. McCoy pleaded not guilty. Throughout the proceedings, he insistently maintained he was out of State at the time of the killings and that corrupt police killed the victims when a drug deal went wrong. App. 284–286. At defense counsel's request, a court-appointed sanity commission examined McCoy and found him competent to stand trial.

In December 2009 and January 2010, McCoy told the court his relationship with assigned counsel had broken down irretrievably. He sought and gained leave to represent himself until his parents engaged new counsel for him. In March 2010, Larry English, engaged by McCoy's parents, enrolled as McCoy's counsel. English eventually concluded that the evidence against McCoy was over-

whelming and that, absent a concession at the guilt stage that McCoy was the killer, a death sentence would be impossible to avoid at the penalty phase.[1] McCoy, English reported, was "furious" when told, two weeks before trial was scheduled to begin, that English would concede McCoy's commission of the triple murders. *Id.*, at 286.[2] McCoy told English "not to make that concession," and English knew of McCoy's "complet[e] oppos[ition] to [English] telling the jury that [McCoy] was guilty of killing the three victims"; instead of any concession, McCoy pressed English to pursue acquittal. *Id.,* at 286–287.

At a July 26, 2011 hearing, McCoy sought to terminate English's representation, *id.*, at 449, and English asked to be relieved if McCoy secured other counsel, *id.*, at 458. With trial set to start two days later, the court refused to relieve English and directed that he remain as counsel of record. *Id.*, at 461. "[Y]ou are the attorney," the court told English when he expressed disagreement with McCoy's wish to put on a defense case, and "you have to make the trial decision of what you're going to proceed with." *Id.*, at 469.

————————

[1] Part of English's strategy was to concede that McCoy committed the murders and to argue that he should be convicted only of second-degree murder, because his "mental incapacity prevented him from forming the requisite specific intent to commit first degree murder." 2014–1449 (La. 10/19/16), 218 So. 3d 535, 570. But the second-degree strategy would have encountered a shoal, for Louisiana does not permit introduction of evidence of a defendant's diminished capacity absent the entry of a plea of not guilty by reason of insanity. *Ibid.*, and n. 35.

[2] The dissent states that English told McCoy his proposed trial strategy eight months before trial. *Post,* at 3. English did encourage McCoy, "[a] couple of months before the trial," to plead guilty rather than proceed to trial. App. 66–67. But English declared under oath that "the first time [he] told [McCoy] that [he] intended to concede to the jury that [McCoy] was the killer" was July 12, 2011, two weeks before trial commenced. *Id.*, at 286. Encouraging a guilty plea pretrial, of course, is not equivalent to imparting to a defendant counsel's strategic determination to concede guilt should trial occur.

At the beginning of his opening statement at the guilt phase of the trial, English told the jury there was "no way reasonably possible" that they could hear the prosecution's evidence and reach "any other conclusion than Robert McCoy was the cause of these individuals' death." *Id.,* at 504. McCoy protested; out of earshot of the jury, McCoy told the court that English was "selling [him] out" by maintaining that McCoy "murdered [his] family." *Id.,* at 505–506. The trial court reiterated that English was "representing" McCoy and told McCoy that the court would not permit "any other outbursts." *Id.,* at 506. Continuing his opening statement, English told the jury the evidence is "unambiguous," "my client committed three murders." *Id.*, at 509. McCoy testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom. In his closing argument, English reiterated that McCoy was the killer. On that issue, English told the jury that he "took [the] burden off of [the prosecutor]." *Id.*, at 647. The jury then returned a unanimous verdict of guilty of first-degree murder on all three counts. At the penalty phase, English again conceded "Robert McCoy committed these crimes," *id.*, at 751, but urged mercy in view of McCoy's "serious mental and emotional issues," *id.*, at 755. The jury returned three death verdicts.

Represented by new counsel, McCoy unsuccessfully moved for a new trial, arguing that the trial court violated his constitutional rights by allowing English to concede McCoy "committed three murders," *id.,* at 509, over McCoy's objection. The Louisiana Supreme Court affirmed the trial court's ruling that defense counsel had authority so to concede guilt, despite the defendant's opposition to any admission of guilt. See 2014–1449 (La. 10/19/16), 218 So. 3d 535. The concession was permissible, the court concluded, because counsel reasonably believed that admitting guilt afforded McCoy the best chance to

avoid a death sentence.

We granted certiorari in view of a division of opinion among state courts of last resort on the question whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection. 582 U. S. \_\_\_ (2017). Compare with the instant case, *e.g., Cooke* v. *State*, 977 A. 2d 803, 842–846 (Del. 2009) (counsel's pursuit of a "guilty but mentally ill" verdict over defendant's "vociferous and repeated protestations" of innocence violated defendant's "constitutional right to make the fundamental decisions regarding his case"); *State* v. *Carter*, 270 Kan. 426, 440, 14 P. 3d 1138, 1148 (2000) (counsel's admission of client's involvement in murder when client adamantly maintained his innocence contravened Sixth Amendment right to counsel and due process right to a fair trial).

## II
## A

The Sixth Amendment guarantees to each criminal defendant "the Assistance of Counsel for his defence." At common law, self-representation was the norm. See *Faretta* v. *California*, 422 U. S. 806, 823 (1975) (citing 1 F. Pollock & F. Maitland, The History of English Law 211 (2d ed. 1909)). As the laws of England and the American Colonies developed, providing for a right to counsel in criminal cases, self-representation remained common and the right to proceed without counsel was recognized. *Faretta*, 422 U. S., at 824–828. Even now, when most defendants choose to be represented by counsel, see, *e.g.,* Goldschmidt & Stemen, Patterns and Trends in Federal *Pro Se* Defense, 1996–2011: An Exploratory Study, 8 Fed. Cts. L. Rev. 81, 91 (2015) (0.2% of federal felony defendants proceeded *pro se*), an accused may insist upon representing herself—however counterproductive that course may be, see *Faretta*, 422 U. S., at 834. As this Court

explained, "[t]he right to defend is personal," and a defendant's choice in exercising that right "must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Ibid.* (quoting *Illinois* v. *Allen*, 397 U. S. 337, 350–351 (1970) (Brennan, J., concurring)); see *McKaskle* v. *Wiggins*, 465 U. S. 168, 176–177 (1984) ("The right to appear *pro se* exists to affirm the dignity and autonomy of the accused.").

The choice is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel. For the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta*, 422 U. S*.,* at 819–820; see *Gannett Co.* v. *DePasquale*, 443 U. S. 368, 382, n. 10 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense"). Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Gonzalez* v. *United States*, 553 U. S. 242, 248 (2008) (internal quotation marks and citations omitted). Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. See *Jones* v. *Barnes*, 463 U. S. 745, 751 (1983).

Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices

about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*. See *Weaver* v. *Massachusetts*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 6) (2017) (self-representation will often increase the likelihood of an unfavorable outcome but "is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty"); *Martinez* v. *Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U. S. 152, 165 (2000) (Scalia, J., concurring in judgment) ("Our system of laws generally presumes that the criminal defendant, after being fully informed, knows his own best interests and does not need them dictated by the State.").

Counsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty, as English did in this case. But the client may not share that objective. He may wish to avoid, above all else, the opprobrium that comes with admitting he killed family members. Or he may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration. See Tr. of Oral Arg. 21–22 (it is for the defendant to make the value judgment whether "to take a minuscule chance of not being convicted and spending a life in . . . prison"); Hashimoto, Resurrecting Autonomy: The Criminal Defendant's Right to Control the Case, 90 B. U. L. Rev. 1147, 1178 (2010) (for some defendants, "the possibility of an acquittal, even if remote, may be more valuable than the difference between a life and a death sentence"); cf. *Jae Lee* v. *United States*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 12) (recognizing that a defendant might reject a plea and prefer "taking a chance at trial" despite "[a]lmost certai[n]" conviction (emphasis deleted)). When a client expressly asserts that the objective of "*his* defence" is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt. U. S. Const., Amdt. 6 (emphasis add-

ed); see ABA Model Rule of Professional Conduct 1.2(a) (2016) (a "lawyer shall abide by a client's decisions concerning the objectives of the representation").

Preserving for the defendant the ability to decide whether to maintain his innocence should not displace counsel's, or the court's, respective trial management roles. See *Gonzalez*, 553 U. S., at 249 ("[n]umerous choices affecting conduct of the trial" do not require client consent, including "the objections to make, the witnesses to call, and the arguments to advance"); cf. *post,* at 8–9. Counsel, in any case, must still develop a trial strategy and discuss it with her client, see *Nixon*, 543 U. S., at 178, explaining why, in her view, conceding guilt would be the best option. In this case, the court had determined that McCoy was competent to stand trial, *i.e.,* that McCoy had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Godinez* v. *Moran*, 509 U. S. 389, 396 (1993) (quoting *Dusky* v. *United States*, 362 U. S. 402 (1960) (*per curiam*)).[3] If, after consultations with English concerning the management of the defense, McCoy disagreed with English's proposal to concede McCoy committed three murders, it was not open to English to override McCoy's objection. English could not interfere with McCoy's telling the jury "I was not the murderer," although counsel could, if consistent with providing effective assistance, focus his own collaboration on urging that McCoy's mental state weighed against conviction. See Tr. of Oral Arg. 21–23.

## B

*Florida* v. *Nixon*, see *supra,* at 1–2, is not to the contrary. Nixon's attorney did not negate Nixon's autonomy by overriding Nixon's desired defense objective, for Nixon

--------

[3] Several times, English did express his view that McCoy was not, in fact, competent to stand trial. See App. 388, 436.

never asserted any such objective. Nixon "was generally unresponsive" during discussions of trial strategy, and "never verbally approved or protested" counsel's proposed approach. 543 U. S., at 181. Nixon complained about the admission of his guilt only after trial. *Id.*, at 185. McCoy, in contrast, opposed English's assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court. See App. 286–287, 456, 505–506. See also *Cooke*, 977 A. 2d, at 847 (distinguishing *Nixon* because, "[i]n stark contrast to the defendant's silence in that case, Cooke repeatedly objected to his counsel's objective of obtaining a verdict of guilty but mentally ill, and asserted his factual innocence consistent with his plea of not guilty"). If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest. Presented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way. See *Gonzalez*, 553 U. S., at 254 (Scalia, J., concurring in judgment) ("[A]ction taken by counsel over his client's objection . . . ha[s] the effect of revoking [counsel's] agency with respect to the action in question.").

The Louisiana Supreme Court concluded that English's refusal to maintain McCoy's innocence was necessitated by Louisiana Rule of Professional Conduct 1.2(d) (2017), which provides that "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent." 218 So. 3d, at 564. Presenting McCoy's alibi defense, the court said, would put English in an "ethical conundrum," implicating English in perjury. *Id.,* at 565 (citing *Nix* v. *Whiteside,* 475 U. S. 157, 173–176 (1986)). But McCoy's case does not resemble *Nix,* where the defendant told his lawyer that he intended to commit perjury. There was no such avowed perjury here. Cf. ABA Model Rule of Professional Conduct

3.3, Comment 8 ("The prohibition against offering false evidence only applies if the lawyer knows that the evidence is false."). English harbored no doubt that McCoy believed what he was saying, see App. 285–286; English simply disbelieved McCoy's account in view of the prosecution's evidence. English's express motivation for conceding guilt was not to avoid suborning perjury, but to try to build credibility with the jury, and thus obtain a sentence lesser than death. *Id.*, at 287. Louisiana's ethical rules might have stopped English from presenting McCoy's alibi evidence if English knew perjury was involved. But Louisiana has identified no ethical rule requiring English to admit McCoy's guilt over McCoy's objection. See 3 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §11.6(c), p. 935 (4th ed. 2015) ("A lawyer is not placed in a professionally embarrassing position when he is reluctantly required . . . to go to trial in a weak case, since that decision is clearly attributed to his client.").

The dissent describes the conflict between English and McCoy as "rare" and "unlikely to recur." *Post,* at 2, 5–7, and n. 2. Yet the Louisiana Supreme Court parted ways with three other State Supreme Courts that have addressed this conflict in the past twenty years. *People* v. *Bergerud*, 223 P. 3d 686, 691 (Colo. 2010) ("Although defense counsel is free to develop defense theories based on reasonable assessments of the evidence, as guided by her professional judgment, she cannot usurp those fundamental choices given directly to criminal defendants by the United States and the Colorado Constitutions."); *Cooke*, 977 A. 2d 803 (Del. 2009); *Carter*, 270 Kan. 426, 14 P. 3d 1138 (2000). In each of the three cases, as here, the defendant repeatedly and adamantly insisted on maintaining his factual innocence despite counsel's preferred course: concession of the defendant's commission of criminal acts and pursuit of diminished capacity, mental illness, or lack of premeditation defenses. See *Bergerud*, 223

P. 3d, at 690–691; *Cooke*, 977 A. 2d, at 814; *Carter*, 270 Kan., at 429, 14 P. 3d, at 1141. These were not strategic disputes about whether to concede an element of a charged offense, cf. *post,* at 8; they were intractable disagreements about the fundamental objective of the defendant's representation. For McCoy, that objective was to maintain "I did not kill the members of my family." Tr. of Oral Arg. 26. In this stark scenario, we agree with the majority of state courts of last resort that counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission.

## III

Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence, *Strickland* v. *Washington*, 466 U. S. 668 (1984), or *United States* v. *Cronic*, 466 U. S. 648 (1984), to McCoy's claim. See Brief for Petitioner 43–48; Brief for Respondent 46–52. To gain redress for attorney error, a defendant ordinarily must show prejudice. See *Strickland*, 466 U. S., at 692. Here, however, the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative.

Violation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called "structural"; when present, such an error is not subject to harmless-error review. See, *e.g., McKaskle*, 465 U. S., at 177, n. 8 (harmless-error analysis is inapplicable to deprivations of the self-representation right, because "[t]he right is either respected or denied; its deprivation cannot be harmless"); *United States* v. *Gonzalez-Lopez*, 548 U. S. 140, 150 (2006) (choice of counsel is structural); *Waller* v. *Georgia*, 467 U. S. 39, 49–50 (1984) (public trial is structural). Structural error "affect[s] the framework within which the trial proceeds," as distinguished from a

lapse or flaw that is "simply an error in the trial process itself." *Arizona* v. *Fulminante*, 499 U. S. 279, 310 (1991). An error may be ranked structural, we have explained, "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Weaver*, 582 U. S., at ___ (slip op., at 6) (citing *Faretta*, 422 U. S., at 834). An error might also count as structural when its effects are too hard to measure, as is true of the right to counsel of choice, or where the error will inevitably signal fundamental unfairness, as we have said of a judge's failure to tell the jury that it may not convict unless it finds the defendant's guilt beyond a reasonable doubt. 582 U. S., at ___–___ (slip op., at 6–7) (citing *Gonzalez-Lopez*, 548 U. S., at 149, n. 4, and *Sullivan* v. *Louisiana*, 508 U. S. 275, 279 (1993)).

Under at least the first two rationales, counsel's admission of a client's guilt over the client's express objection is error structural in kind. See *Cooke*, 977 A. 2d, at 849 ("Counsel's override negated Cooke's decisions regarding his constitutional rights, and created a structural defect in the proceedings as a whole."). Such an admission blocks the defendant's right to make the fundamental choices about his own defense. And the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt. McCoy must therefore be accorded a new trial without any need first to show prejudice.[4]

---

[4] The dissent suggests that a remand would be in order, so that the Louisiana Supreme Court, in the first instance, could consider the structural-error question. See *post,* at 10–11. "[W]e did not grant certiorari to review" that question. *Post,* at 10. But McCoy raised his structural-error argument in his opening brief, see Brief for Petitioner 38–43, and Louisiana explicitly chose not to grapple with it, see Brief

\*      \*      \*

Larry English was placed in a difficult position; he had an unruly client and faced a strong government case. He reasonably thought the objective of his representation should be avoidance of the death penalty. But McCoy insistently maintained: "I did not murder my family." App. 506. Once he communicated that to court and counsel, strenuously objecting to English's proposed strategy, a concession of guilt should have been off the table. The trial court's allowance of English's admission of McCoy's guilt despite McCoy's insistent objections was incompatible with the Sixth Amendment. Because the error was structural, a new trial is the required corrective.

For the reasons stated, the judgment of the Louisiana Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

_____

for Respondent 45, n. 5. In any event, "we have the authority to make our own assessment of the harmlessness of a constitutional error in the first instance." *Yates* v. *Evatt*, 500 U. S. 391, 407 (1991) (citing *Rose* v. *Clark*, 478 U. S. 570, 584 (1986)).

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–8255

_____

## ROBERT LEROY McCOY, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[May 14, 2018]

JUSTICE ALITO, with whom JUSTICE THOMAS and
JUSTICE GORSUCH join, dissenting.

The Constitution gives us the authority to decide real
cases and controversies; we do not have the right to sim-
plify or otherwise change the facts of a case in order to
make our work easier or to achieve a desired result.  But
that is exactly what the Court does in this case.  The
Court overturns petitioner's convictions for three counts of
first-degree murder by attributing to his trial attorney,
Larry English, something that English never did.  The
Court holds that English violated petitioner's constitu-
tional rights by "admit[ting] h[is] client's guilt of a charged
crime over the client's intransigent objection."  *Ante*, at
11.[1]  But English did not admit that petitioner was guilty

————————

[1] When the Court expressly states its holding, it refers to a concession
of guilt.  See *ante*, at 1–2 ("We hold that a defendant has the right to
insist that counsel refrain from admitting guilt, even when counsel's
experienced-based view is that confessing guilt offers the defendant the
best chance to avoid the death penalty"); *ante*, at 11 ("counsel may not
admit her client's guilt of a charged crime over the client's intransigent
objection to that admission").  The opinion also contains many other
references to the confession or admission of guilt.  See, *e.g.*, *ante*, at 2
("confessing guilt"; "admit guilt"); *ante*, at 4 ("admitting guilt"); *ante*, at
5 ("concede guilt"); *ante*, at 6 ("maintaining her innocence at the guilt
phase"); *ante*, at 7 ("concession of guilt"); *ante*, at 8 ("conceding guilt");
*ante*, at 9 ("assertion of his guilt"); *ante*, at 10 ("conceding guilt"; "admit
McCoy's guilt"); *ante*, at 13 ("concession of guilt"; "admission of McCoy's

of first-degree murder. Instead, faced with overwhelming
evidence that petitioner shot and killed the three victims,
English admitted that petitioner committed one element of
that offense, *i.e.*, that he killed the victims. But English
strenuously argued that petitioner was not guilty of first-
degree murder because he lacked the intent (the *mens rea*)
required for the offense. App. 508–512. So the Court's
newly discovered fundamental right simply does not apply
to the real facts of this case.

## I

The real case is far more complex. Indeed, the real
situation English faced at the beginning of petitioner's
trial was the result of a freakish confluence of factors that
is unlikely to recur.

Retained by petitioner's family, English found himself in
a predicament as the trial date approached. The evidence
against his client was truly "overwhelming," as the Loui-
siana Supreme Court aptly noted. 2014–1449 (La.
10/19/16), 218 So. 3d 535, 565 (2016). Among other things,
the evidence showed the following. Before the killings
took place, petitioner had abused and threatened to kill
his wife, and she was therefore under police protection.
On the night of the killings, petitioner's mother-in-law
made a 911 call and was heard screaming petitioner's first
name. She yelled: "'She ain't here, Robert . . . I don't know
where she is. The detectives have her. Talk to the detec-
tives. She ain't in there, Robert.'" *Id.*, at 542. Moments
later, a gunshot was heard, and the 911 call was

———————

guilt").

At a few points, however, the Court refers to the admission of crimi-
nal "acts." *Ante*, at 1, 7, 10. A rule that a defense attorney may not
admit the *actus reus* of an offense (or perhaps even any element of the
*actus reus*) would be very different from the rule that the Court ex-
pressly adopts. I discuss some of the implications of such a broad rule
in Part III of this opinion.

disconnected.

Officers were dispatched to the scene, and on arrival, they found three dead or dying victims—petitioner's mother-in-law, her husband, and the teenage son of petitioner's wife. The officers saw a man who fit petitioner's description fleeing in petitioner's car. They chased the suspect, but he abandoned the car along with critical evidence linking him to the crime: the cordless phone petitioner's mother-in-law had used to call 911 and a receipt for the type of ammunition used to kill the victims. Petitioner was eventually arrested while hitchhiking in Idaho, and a loaded gun found in his possession was identified as the one used to shoot the victims. In addition to all this, a witness testified that petitioner had asked to borrow money to purchase bullets shortly before the shootings, and surveillance footage showed petitioner purchasing the ammunition on the day of the killings. And two of petitioner's friends testified that he confessed to killing at least one person.

Despite all this evidence, petitioner, who had been found competent to stand trial and had refused to plead guilty by reason of insanity, insisted that he did not kill the victims. He claimed that the victims were killed by the local police and that he had been framed by a farflung conspiracy of state and federal officials, reaching from Louisiana to Idaho. Petitioner believed that even his attorney and the trial judge had joined the plot. App. 509.

Unwilling to go along with this incredible and uncorroborated defense, English told petitioner "some eight months" before trial that the only viable strategy was to admit the killings and to concentrate on attempting to avoid a sentence of death. 218 So. 3d, at 558. At that point—aware of English's strong views—petitioner could have discharged English and sought new counsel willing to pursue his conspiracy defense; under the Sixth Amendment, that was his right. See *United States* v.

*Gonzalez-Lopez*, 548 U. S. 140, 144 (2006). But petitioner stated "several different times" that he was "confident with Mr. English." App. 411, 437.

The weekend before trial, however, petitioner changed his mind. He asked the trial court to replace English, and English asked for permission to withdraw. Petitioner stated that he had secured substitute counsel, but he was unable to provide the name of this new counsel, and no new attorney ever appeared. The court refused these requests and also denied petitioner's last-minute request to represent himself. (Petitioner does not challenge these decisions here.) So petitioner and English were stuck with each other, and petitioner availed himself of his right to take the stand to tell his wild story. Under those circumstances, what was English supposed to do?

The Louisiana Supreme Court held that English could not have put on petitioner's desired defense without violating state ethics rules, see 218 So. 3d, at 564–565, but this Court effectively overrules the state court on this issue of state law, *ante*, at 9–10. However, even if it is assumed that the Court is correct on this ethics issue, the result of mounting petitioner's conspiracy defense almost certainly would have been disastrous. That approach stood no chance of winning an acquittal and would have severely damaged English's credibility in the eyes of the jury, thus undermining his ability to argue effectively against the imposition of a death sentence at the penalty phase of the trial. As English observed, taking that path would have only "help[ed] the District Attorney send [petitioner] to the death chamber." App. 396. (In *Florida* v. *Nixon*, 543 U. S. 175, 191–192 (2004), this Court made essentially the same point.) So, again, what was English supposed to do?

When pressed at oral argument before this Court, petitioner's current counsel eventually provided an answer: English was not required to take any affirmative steps to support petitioner's bizarre defense, but instead of conced-

ing that petitioner shot the victims, English should have ignored that element entirely. Tr. of Oral Arg. 21–23. So the fundamental right supposedly violated in this case comes down to the difference between the two statements set out below.

> *Constitutional*: "First-degree murder requires proof both that the accused killed the victim and that he acted with the intent to kill. I submit to you that my client did not have the intent required for conviction for that offense."
> *Unconstitutional*: "First-degree murder requires proof both that the accused killed the victim and that he acted with the intent to kill. I admit that my client shot and killed the victims, but I submit to you that he did not have the intent required for conviction for that offense."

The practical difference between these two statements is negligible. If English had conspicuously refrained from endorsing petitioner's story and had based his defense solely on petitioner's dubious mental condition, the jury would surely have gotten the message that English was essentially conceding that petitioner killed the victims. But according to petitioner's current attorney, the difference is fundamental. The first formulation, he admits, is perfectly fine. The latter, on the other hand, is a violation so egregious that the defendant's conviction must be reversed even if there is no chance that the misstep caused any harm. It is no wonder that the Court declines to embrace this argument and instead turns to an issue that the case at hand does not actually present.

## II

The constitutional right that the Court has now discovered—a criminal defendant's right to insist that his attorney contest his guilt with respect to all charged offenses—

is like a rare plant that blooms every decade or so. Having made its first appearance today, the right is unlikely to figure in another case for many years to come. Why is this so?

First, it is hard to see how the right could come into play in any case other than a capital case in which the jury must decide both guilt and punishment. In all other cases, guilt is almost always the only issue for the jury, and therefore admitting guilt of all charged offenses will achieve nothing. It is hard to imagine a situation in which a competent attorney might take that approach. So the right that the Court has discovered is effectively confined to capital cases.

Second, few rational defendants facing a possible death sentence are likely to insist on contesting guilt where there is no real chance of acquittal and where admitting guilt may improve the chances of avoiding execution. Indeed, under such circumstances, the odds are that a rational defendant will plead guilty in exchange for a life sentence. By the same token, an attorney is unlikely to insist on admitting guilt over the defendant's objection unless the attorney believes that contesting guilt would be futile. So the right is most likely to arise in cases involving irrational capital defendants.[2]

Third, where a capital defendant and his retained attorney cannot agree on a basic trial strategy, the attorney and client will generally part ways unless, as in this case, the court is not apprised until the eve of trial. The client will then either search for another attorney or decide to represent himself. So the field of cases in which this right

––––––––––

[2] The Court imagines cases in which a rational defendant prefers even a minuscule chance of acquittal over either the social opprobrium that would result from an admission of guilt or the sentence of imprisonment that would be imposed upon conviction. *Ante*, at 7. Such cases are likely to be rare, and in any event, as explained below, the defendant will almost always be able to get his way if he acts in time.

might arise is limited further still—to cases involving irrational capital defendants who disagree with their attorneys' proposed strategy yet continue to retain them.

Fourth, if counsel is appointed, and unreasonably insists on admitting guilt over the defendant's objection, a capable trial judge will almost certainly grant a timely request to appoint substitute counsel. And if such a request is denied, the ruling may be vulnerable on appeal.

Finally, even if all the above conditions are met, the right that the Court now discovers will not come into play unless the defendant expressly protests counsel's strategy of admitting guilt. Where the defendant is advised of the strategy and says nothing, or is equivocal, the right is deemed to have been waived. See *Nixon*, 543 U. S., at 192.

In short, the right that the Court now discovers is likely to appear only rarely,[3] and because the present case is so unique, it is hard to see how it meets our stated criteria for granting review. See this Court's Rules 10(b)–(c). Review would at least be understandable if the strategy that English pursued had worked an injustice, but the Court does not make that claim—and with good reason. Endorsing petitioner's bizarre defense would have been extraordinarily unwise, and dancing the fine line recommended by petitioner's current attorney would have done

_____

[3]The Court responds that three State Supreme Courts have "addressed this conflict in the past twenty years." *Ante*, at 10. Even if true, that would hardly be much of a rebuttal. Moreover, two of the three decisions were not based on the right that the Court discovers and applies here, *i.e.*, "the right to insist that counsel refrain from admitting guilt." *Ante*, at 1–2. In *People* v. *Bergerud*, 223 P. 3d 686 (Colo. 2010), the court found that defense counsel *did not* admit guilt, and the court's decision (which did not award a new trial) was based on other grounds. *Id.*, at 692, 700, 707. In *State* v. *Carter*, 270 Kan. 426, 14 P. 3d 1138 (2000), defense counsel did not admit his client's guilt on all charges. Instead, he contested the charge of first-degree murder but effectively admitted the elements of a lesser homicide offense. *Id.*, at 431–433, 14 P. 3d, at 1143.

no good. It would have had no effect on the outcome of the trial, and it is hard to see how that approach would have respected petitioner's "autonomy," *ante*, at 6, 7, 8, 11, any more than the more straightforward approach that English took. If petitioner is retried, it will be interesting to see what petitioner's current counsel or any other attorney to whom the case is handed off will do. It is a safe bet that no attorney will put on petitioner's conspiracy defense.

## III

While the question that the Court decides is unlikely to make another appearance for quite some time, a related—and difficult—question may arise more frequently: When guilt is the sole issue for the jury, is it ever permissible for counsel to make the unilateral decision to concede an element of the offense charged? If today's decision were understood to address that question, it would have important implications.

Under current precedent, there are some decisions on which a criminal defendant has the final say. For example, a defendant cannot be forced to enter a plea against his wishes. See *Brookhart* v. *Janis*, 384 U. S. 1, 5–7 (1966). Similarly, no matter what counsel thinks best, a defendant has the right to insist on a jury trial and to take the stand and testify in his own defense. See *Harris* v. *New York*, 401 U. S. 222, 225 (1971). And if, as in this case, a defendant and retained counsel do not see eye to eye, the client can always attempt to find another attorney who will accede to his wishes. See *Gonzalez-Lopez*, 548 U. S., at 144. A defendant can also choose to dispense with counsel entirely and represent himself. See *Faretta* v. *California*, 422 U. S. 806, 819 (1975).

While these fundamental decisions must be made by a criminal defendant, most of the decisions that arise in criminal cases are the prerogative of counsel. (Our adversarial system would break down if defense counsel were

required to obtain the client's approval for every important move made during the course of the case.) Among the decisions that counsel is free to make unilaterally are the following: choosing the basic line of defense, moving to suppress evidence, delivering an opening statement and deciding what to say in the opening, objecting to the admission of evidence, cross-examining witnesses, offering evidence and calling defense witnesses, and deciding what to say in summation. See, *e.g.*, *New York* v. *Hill*, 528 U. S. 110, 114–115 (2000). On which side of the line does conceding some but not all elements of the charged offense fall?

Some criminal offenses contain elements that the prosecution can easily prove beyond any shadow of a doubt. A prior felony conviction is a good example. See 18 U. S. C. §922(g) (possession of a firearm by a convicted felon). Suppose that the prosecution is willing to stipulate that the defendant has a prior felony conviction but is prepared, if necessary, to offer certified judgments of conviction for multiple prior violent felonies. If the defendant insists on contesting the convictions on frivolous grounds, must counsel go along? Does the same rule apply to all elements? If there are elements that may not be admitted over the defendant's objection, must counsel go further and actually contest those elements? Or is it permissible if counsel refrains from expressly conceding those elements but essentially admits them by walking the fine line recommended at argument by petitioner's current attorney?

What about conceding that a defendant is guilty, not of the offense charged, but of a lesser included offense? That is what English did in this case. He admitted that petitioner was guilty of the noncapital offense of second-degree murder in an effort to prevent a death sentence.

App. 651.[4]  Is admitting guilt of a lesser included offense over the defendant's objection always unconstitutional? Where the evidence strongly supports conviction for first-degree murder, is it unconstitutional for defense counsel to make the decision to admit guilt of any lesser included form of homicide—even manslaughter?  What about simple assault?

These are not easy questions, and the fact that they have not come up in this Court for more than two centuries suggests that they will arise infrequently in the future.  I would leave those questions for another day and limit our decision to the particular (and highly unusual) situation in the actual case before us.  And given the situation in which English found himself when trial commenced, I would hold that he did not violate any fundamental right by expressly acknowledging that petitioner killed the victims instead of engaging in the barren exercise that petitioner's current counsel now recommends.

## IV

Having discovered a new right not at issue in the real case before us, the Court compounds its error by summarily concluding that a violation of this right "ranks as error of the kind our decisions have called 'structural.'"  *Ante*, at 11.

The Court concedes that the Louisiana Supreme Court did not decide the structural-error question and that we "'did not grant certiorari to review' that question."  *Ante*,

---

[4] The Court asserts that, under Louisiana law, English's "second-degree strategy would have encountered a shoal" and necessarily failed. *Ante*, at 3, n. 1.  But the final arbiter of Louisiana law—the Louisiana Supreme Court—disagreed.  It held that "[t]he jury was left with several choices" after English's second-degree concession, "including returning a responsive verdict of second degree murder" and "not returning the death penalty."  2014–1449 (La. 10/19/16), 218 So. 3d 535, 572 (2016).

at 12, n. 4. We have stated time and again that we are "a court of review, not of first view" and, for that reason, have refused to decide issues not addressed below. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005); see also, *e.g.*, *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 29); *McWilliams* v. *Dunn*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 16); *County of Los Angeles* v. *Mendez*, 581 U. S. \_\_\_, \_\_\_, n. (2017) (slip op., at 8, n.); *BNSF R. Co.* v. *Tyrrell*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 12); *Goodyear Tire & Rubber Co.* v. *Haeger*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 13); *McLane Co.* v. *EEOC*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 11); *Expressions Hair Design* v. *Schneiderman*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 10); *Manuel* v. *Joliet*, 580 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 14).

In this case, however, the court-of-review maxim does not suit the majority's purposes, so it is happy to take the first view. And the majority does so without adversarial briefing on the question. See Brief for Respondent 45–46, n. 5.[5] Under comparable circumstances, we have refrained from taking the lead on the question of structural error. See *e.g.*, *Sandstrom* v. *Montana*, 442 U. S. 510, 526–527 (1979); *Faretta*, 422 U. S., at 836; *id.*, at 852 (Blackmun, J., dissenting). There is no good reason to take a different approach in this case.

\*    \*    \*

The Court ignores the question actually presented by the case before us and instead decides this case on the

———————

[5] Indeed, the Court actually *faults* the State for not "grappl[ing] with" an argument raised for the first time in petitioner's opening brief. *Ante*, at 12, n. 4. But how can it blame the State? This Court has said, time and again, that when "petitioners d[o] not raise [an] issue" until the merits stage, "we will not consider [the] argument." *Chandris, Inc.* v. *Latsis*, 515 U. S. 347, 354, n. (1995); see also, *e.g.*, *Taylor* v. *Freeland & Kronz*, 503 U. S. 638, 645–646 (1992). That is also what our Rules say. See *Yee* v. *Escondido*, 503 U. S. 519, 535–538 (1992). Why is this case any different?

ALITO, J., dissenting

basis of a newly discovered constitutional right that is not implicated by what really occurred at petitioner's trial. I would base our decision on what really took place, and under the highly unusual facts of this case, I would affirm the judgment below.

I therefore respectfully dissent.