NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAY 26 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff - Appellee, <br><br> v. <br><br> LAWRENCE J. GERRANS, AKA Larry Gerrans, <br><br> Defendant - Appellant. | No. 24-6740 <br><br> D.C. Nos. 3:23-cv-00801-EMC <br> 3:18-cr-00310-EMC-1 <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Submitted April 21, 2026[**]
San Francisco, California

Before: S.R. THOMAS, CHRISTEN, and FORREST, Circuit Judges;
Concurrence by Judge Forrest.

Lawrence J. Gerrans appeals the district court's denial of his 28 U.S.C. §

2255 motion challenging his convictions and sentence for wire fraud, money

---

[*]       This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]      The panel unanimously concludes this case is suitable for decision without oral argument.  *See* Fed. R. App. P. 34(a)(2).

laundering, making false statements, contempt of court, witness tampering, and obstruction of justice. Gerrans argues that the record established his trial counsel was ineffective pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), and violated his right to maintain his innocence pursuant to *McCoy v. Louisiana*, 584 U.S. 414 (2018). In the alternative, Gerrans contends that the district court abused its discretion by denying an evidentiary hearing on both questions. We have jurisdiction pursuant to 28 U.S.C. § 2253(a). We review de novo the denial of a § 2255 motion, *United States v. Fredman*, 390 F.3d 1153, 1156 (9th Cir. 2004), and review any factual findings for clear error, *United States v. Villa-Gonzalez*, 208 F.3d 1160, 1165 (9th Cir. 2000) (per curiam). We review for abuse of discretion "[a] district court's decision to deny an evidentiary hearing on a § 2255 motion." *United States v. Chacon-Palomares*, 208 F.3d 1157, 1158–59 (9th Cir. 2000). Because the parties are familiar with the record, we do not recount the facts in their entirety. We affirm the district court's order denying Gerrans's motion.

    1. <u>Ineffective Assistance of Counsel</u>. A federal jury convicted Gerrans on all 12 counts of the second superseding indictment. Gerrans argues that his trial counsel, Getz, rendered ineffective assistance and that he was prejudiced by these deficiencies. "A claim of ineffective assistance of counsel raises a mixed question of law and fact, which we review de novo." *Id.* at 1158. We conclude that, even if Gerrans's trial counsel's performance was deficient, Gerrans has not met his

burden of proving prejudice as required by *Strickland*, 466 U.S. at 687, 697.  To satisfy *Strickland*'s prejudice requirement, Gerrans "must show that there is a reasonable probability that . . . the result of the proceeding would have been different" after "consider[ing] the totality of the evidence before the . . . jury." *Id.* at 694–95.

Counts 1–3 charged Gerrans with wire fraud and Count 6 charged him with money laundering related to transfers of funds from Sanovas, Inc.  The evidence showed that Gerrans made three transfers to himself: $80,000 to his company Halo Management Group on March 13, 2015 (Count 1); $250,000 to his company Hartford Legend Capital Enterprises on March 16, 2015 (Count 2); and another $250,000 to Hartford on March 16, 2015 (Count 3).  Gerrans then wired $2.3 million of Sanovas's funds to himself on March 17, 2015, to purchase a family home (Count 6).  Gerrans's primary argument regarding these counts is that his lawyer failed to allow him to testify that he believed he was entitled—and was in fact entitled—to the money he took from Sanovas, even if he overestimated the amount due to him.  Gerrans also argues that testimony from his wife, the former Sanovas CFO, a Sanovas accountant, and an outside accountant would have substantiated his version of events.

We agree with the district court that there was overwhelming evidence of guilt on these counts.  First, the decision not to testify was Gerrans's to make, and

he waived this right. Second, his testimony would not have had a reasonable probability of changing the outcome in light of other evidence introduced at trial. The jury heard that Gerrans represented to the board that he had liquidated his retirement account to fund Sanovas in its early stages, which led the board to approve a resolution to reimburse him. But the jury also heard evidence that Gerrans used the funds from his retirement accounts to purchase a diamond ring and a Maserati, not to finance Sanovas. Three Sanovas board members testified that they never received Gerrans's existing employment agreement and would not have approved a new employment agreement had they known Gerrans had already transferred more than $2 million from Sanovas to himself. This evidence showed the jury that Gerrans's actions were part of a pattern of deception in stealing from Sanovas.

The jury also heard that Gerrans transferred Sanovas funds to two shell companies he controlled, Halo and Hartford, which he did not disclose to the board. Finally, Gerrans's brother, Chris, testified that Gerrans generated a number of invoices in 2014 and directed Chris to pay them. The invoices were backdated to 2009 for work that Gerrans and his wife, Shelly, allegedly performed. Multiple witnesses testified that they never saw Shelly perform work for Sanovas. And in the couple's bankruptcy proceedings, Shelly testified that she was a homemaker and earned no income.

4                                    24-6740

Counts 4–5 charged Gerrans with wire fraud related to transfers that took place in 2017. The evidence showed Gerrans used Sanovas's credit card to pay $32,395.77 in property taxes on his family home (Count 4); and to pay $12,500 for carpets for that home (Count 5). Gerrans argues that his trial testimony would have shown that he had a good faith belief that he was authorized to make personal charges on Sanovas's credit cards, or that the charges cancelled out debt owed to him. But the evidence did not show that Sanovas was indebted to Gerrans. And though Gerrans also argues that the testimony of Sanovas's former CFO would have established that he was authorized to use Sanovas's credit cards, the jury heard Gerrans's brother, Chris, testify that Gerrans instructed him to improperly code some of his expenses, including the house expenses charged in the indictment. Sanovas's controller testified that Sanovas paid $176,000 for Gerrans's personal expenses through 2013, which provided evidence that Gerrans routinely misused Sanovas's credit cards.

Counts 7–9 charged Gerrans with making false statements to the FBI in 2017 in the form of three false documents. Count 7 was for falsified invoices related to work that his wife allegedly performed for Sanovas. Gerrans argues that his and Shelly's bankruptcy-related documentation and testimony were compatible with representations he and Shelly made during the bankruptcy proceeding because Sanovas was not profitable at the time they filed for bankruptcy. Gerrans also

argues that there was evidence of the work Shelly did for Sanovas, such as "documentation that Shelly oversaw ordering supplies for Sanovas and worked conferences." But multiple witnesses testified that Shelly never worked for Sanovas, and Gerrans and Shelly signed statements in their bankruptcy proceedings representing that Sanovas was not a source of income for either of them as of April 2010.

Count 8 charged Gerrans with falsifying invoices related to work that he allegedly performed for Sanovas. Gerrans argues there was evidence that these invoices reflected work he actually did and that they were merely backdated to indicate when he performed the services. But Chris testified that his brother personally instructed him to create the false invoices, dated January through March 2010, years after Gerrans and Shelly supposedly completed this work. Count 9 related to a promissory note issued to Gerrans and his wife representing a $2.3 million loan secured by their home supposedly issued by Gerrans's company, Hartford. Gerrans argues that he and his wife would have testified that the promissory note was valid and that their failure to disclose it on an application for a $750,000 bank loan, also secured by their home, was rational because they "entirely controlled" Hartford. But the jury heard evidence that the Hartford loan was not recorded on the house's title; that Gerrans did not report that there were any outstanding loans against the home when he applied for a mortgage on it; and

that Hartford never filed any tax returns. We are not persuaded that Gerrans's counsel overlooked viable defenses to Counts 7–9.

Counts 10–12 related to Gerrans's post-indictment interactions with his brother, Chris. Count 10 charged Gerrans with contempt of court arising from the violation of his release order. Count 11 charged Gerrans with witness tampering related to knowingly obstructing his brother's testimony. Count 12 charged Gerrans with obstruction of justice related to his use of threats to impede the prosecution. Gerrans argues that his trial counsel misunderstood the terms of the release order and did not know that it allowed him to talk with Chris about topics other than the pending criminal case. He also argues that his own testimony and that of his father and another brother would have rebutted Chris's testimony, and that his trial counsel was deficient for not calling the storage facility employees to describe the argument that took place at the storage facility as less serious than the government depicted. This does not change the overwhelming evidence of Gerrans's guilt on Counts 10–12. The jury heard eyewitness testimony from Chris and one of the two storage facility employees about the argument at the storage facility. Both described it as involving Gerrans's physical aggression toward Chris regarding Gerrans's criminal proceedings. The jury also saw a security camera video of the altercation and Chris testified about other conversations in which Gerrans discussed the pending charges. Further, the government introduced

evidence that Gerrans gave Chris a burner phone to allow them to communicate without detection after the district court had ordered Gerrans not to discuss the case with Chris.

In sum, Gerrans did not meet his burden of proving that he was prejudiced by his trial counsel's performance, and this is fatal to his *Strickland* claim. *See* 466 U.S. at 687.

2. The Right to an Evidentiary Hearing on the *Strickland* Claim. The district court did not abuse its discretion in denying an evidentiary hearing on this claim because the record conclusively established that Gerrans was not entitled to relief. The same district court judge who presided at trial ruled on the § 2255 motion and thoroughly addressed the evidence Gerrans submitted in support of his habeas motion. *See United States v. Schaflander*, 743 F.2d 714, 717, 722 (9th Cir. 1984).

3. The Right to Maintain His Innocence. Gerrans contends that his counsel violated his right to maintain his innocence pursuant to *McCoy*, 584 U.S. 414, because in his closing argument, his counsel said that Gerrans and Chris met despite a no contact order entered by the district court. "We review de novo whether there has been a violation of the Sixth Amendment right to make a defense." *United States v. Brown*, 859 F.3d 730, 733 (9th Cir. 2017) (citation modified). *McCoy* was a capital case in which "the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission

of guilt." 584 U.S. at 417. Over his objection, counsel conceded that the defendant committed the charged offenses. *Id.* The Supreme Court held, "a defendant has the right to insist that counsel refrain from admitting guilt," even when counsel's view is that confessing guilt is the best way to avoid the death penalty. *Id.*

Here, after the government presented eyewitness testimony and video evidence of Gerrans's contact with his brother, defense counsel essentially argued that contact between family members is inevitable. As the district court recognized, Gerrans did not allege that he instructed his counsel not to concede that he had contact with his brother. *See id.* (distinguishing the facts in *McCoy* from those in *Florida v. Nixon*, 543 U.S. 175 (2004), where the Supreme Court explained, "*when counsel confers with the defendant* and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, '[no] blanket rule demand[s] the defendant's explicit consent' to implementation of that strategy" (emphasis added) (quoting *Nixon*, 543 U.S. at 181, 192)). Gerrans failed to show that his counsel violated his Sixth Amendment right pursuant to *McCoy*.

4. The Right to an Evidentiary Hearing on the *McCoy* Claim. The district court did not abuse its discretion in denying an evidentiary hearing on Gerrans's

9                                                          24-6740

*McCoy* argument because Gerrans's ineligibility for relief was conclusively

established by the record. *See Schaflander*, 743 F.2d at 717, 721.

**AFFIRMED.**



*United States v. Gerrans*, No. 24-6740

FORREST, Circuit Judge, concurring in the judgment:

I agree that the district court did not err in denying Appellant Lawrence Gerrans's 28 U.S.C. § 2255 motion challenging his conviction and sentence and, therefore, I concur in the judgment.

1