Filed 4/5/19 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C085091 |
| Plaintiff and Respondent, | (Super. Ct. No. 16F2585) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| MORGAN EASTWOOD EDDY, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 26, 2019, be modified as follows:

At the end of the first paragraph of the opinion, place the following footnote:

In his petition for rehearing, defendant correctly argues that if his conviction for first degree murder was not supported by substantial evidence, retrial on that charge would be barred by double jeopardy. (See *Burks v. United States* (1978) 437 U.S. 1, 14-18 [57 L.Ed.2d 1, 11-14]; *People v. Hatch* (2000) 22 Cal.4th 260, 271-272.) However,

1

the record in this case contains substantial evidence from which a rational jury could find premeditation and deliberation. (See *People v. Solomon* (2010) 49 Cal.4th 792, 811-813 [reaffirming that premeditation and deliberation may occur quickly].) Viewing the record and rational inferences that may be drawn therefrom in the light most favorable to the judgment (*id.* at pp. 811-812), the heated argument and physical altercation between defendant and the victim ended when defendant agreed to leave. Rather than leaving peacefully, however, the evidence showed that defendant used the pause in the fighting to arm himself with a knife, exit the apartment, and stab the unwitting victim in the side three times, killing him. Defendant then discarded the knife under the kitchen table before fleeing the scene. Thus, defendant's manner of killing, motive, and planning activity support the inference that he acted with " 'preexisting thought and reflection rather than [out of an] unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443; see also *Solomon*, *supra*, at p. 812 [noting the relevancy of planning activity, motive, and manner of killing to establish premeditation for first degree murder].) Because we find substantial evidence of first degree premeditated murder, defendant's petition for rehearing is denied.

There is no change in the judgment.

The petition for rehearing is denied.

BY THE COURT:

      BLEASE      , Acting P. J.

      MAURO      , J.

      KRAUSE      , J.

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C085091 |
| Plaintiff and Respondent, | (Super. Ct. No. 16F2585) |
| v. | |
| MORGAN EASTWOOD EDDY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Shasta County, Stephen H. Baker, Judge.  Reversed with directions.

Candace Hale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

This appeal presents an issue of fundamental importance to all defendants facing criminal prosecution in California: whether the Sixth Amendment to the United States Constitution, as interpreted by the Supreme Court of the United States in *McCoy v. Louisiana* (2018) 584 U.S. __ [200 L.Ed.2d 821] (*McCoy*), affords a defendant an absolute right to decide the objective of his defense and to insist that his counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt might yield the best outcome at trial. Because we conclude that defendant's absolute right under *McCoy* to maintain his innocence was violated, we must reverse both his conviction for first degree murder (Pen. Code, § 187, subd. (a))[1] and the associated finding of true on the special allegation that he used a knife in the commission of the crime (§ 12022, subd. (b)). Having determined that defendant is entitled to a new trial, we do not reach his remaining contentions.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Morgan Eastwood Eddy and the victim often spent time at Lonnie L.'s apartment. At some point, however, Lonnie decided that defendant was no longer allowed in the residence. On the day of the victim's death, defendant came to the apartment and Lonnie asked him to leave. Defendant initially complied, but shortly after Lonnie left, defendant returned. The victim then told defendant to leave. The victim and defendant subsequently yelled at each other and engaged in aggressive, mutual hand-to-hand combat inside and outside of the apartment, which was observed by multiple individuals. At one point, the victim had defendant pinned on the ground and repeatedly asked defendant if he would leave if the victim let him go. Carl C., who also lived in the apartment and was present during the altercation, told the men not to fight, and reminded them they were friends.

---

[1] Undesignated statutory references are to the Penal Code.

Defendant eventually agreed to leave and the victim went outside. The victim was turning to his right when Joseph S., a neighbor, saw defendant exit the apartment and strike the victim in the abdomen three times with a clenched fist in a sideways motion, consistent with a stabbing. Joseph did not see a weapon but heard sounds consistent with punches connecting. The victim, looking in defendant's direction with a terrified expression, exclaimed, "You stabbed me!"[2] and fell to the ground. Joseph saw defendant briefly reenter the apartment to grab a bag before fleeing the scene. Joseph did not see defendant discard anything in the apartment. Joseph attempted to pursue defendant after seeing blood on the victim's shirt.

Carl testified that after the fight was over, but before the stabbing, he saw defendant grab something from the apartment, but he could not say whether it was a knife. After defendant left the apartment, Carl heard the victim yell, "Ooo, you stabbed me." Carl found the victim lying on the ground and called 911. After briefly speaking with a responding officer, Carl retreated into the apartment and took a shower.

Officer Peggy Porter tried to reinitiate contact with Carl for at least 30 minutes following their brief conversation. Once Officer Porter gained access to the apartment, she conducted a visual search, but did not find the murder weapon. A short time later, a knife was recovered from under the kitchen table when Officer Porter returned to the scene following a phone call from Lonnie.[3]

---

[2] Another neighbor, Bernardino C., heard the victim say, "Really, you stabbed me?" This neighbor was distracted by his children and did not see defendant leave, nor did he see the victim fall. Bernardino saw Carl in the kitchen during the fight, but did not see defendant in the kitchen. This is pertinent because the knife used to stab the victim had been left on the kitchen counter after it was used to cut cinnamon rolls earlier in the day.

[3] Officer Porter explained in her testimony that she had not searched under the table during her canvas of the apartment.

3

DNA testing matched the blood on the knife to the victim. Neither of the two DNA profiles developed from the blade matched defendant, no profiles were developed from the handle, and although there were possible fingerprints on the blade, the criminalist was not asked to analyze them.

Officer Porter also testified regarding her contact with the victim, who was unresponsive but had a pulse. The victim was treated by paramedics, who transported him to the hospital where he was later declared dead. A forensic pathologist testified the victim bled to death as a result of a single stab wound to the lower abdomen, which cut the lower aorta and vena cava. The jury found defendant guilty of first degree murder (§ 187, subd. (a)) and found true the special allegation that he had used a knife (§ 12022, subd. (b)).

At his sentencing hearing, defendant made a *Marsden*[4] request to replace his counsel, which the trial court denied. The court imposed a sentence of 25 years to life, plus one year for the knife enhancement. The court also imposed various fines and fees and awarded victim restitution, none of which are challenged on appeal. Defendant timely appealed.

## DISCUSSION

Defendant argues trial counsel violated his "Sixth Amendment right to choose the objective of his defense by conceding guilt against his express wishes." The People counter that the United States Supreme Court's opinion in *McCoy* is distinguishable because in this case, defendant did not consistently assert his right to maintain innocence as the objective of his defense, did not object to counsel's concession of guilt until after he was convicted, and did not present an alibi defense like the defendant in *McCoy*.

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

4

We find that the record before us establishes that, under *McCoy*, defendant's Sixth Amendment rights were violated by his counsel's actions and find no meaningful basis upon which to distinguish this case from *McCoy*'s recognition of a defendant's absolute right to maintain innocence as the objective of his defense.

A.      *Procedural History Relevant to Defendant's Sixth Amendment Claim*

In his opening statement, given on May 23, 2017, trial counsel established defendant's initial strategy for defending the case—factual innocence. Counsel stated there was no evidence that defendant ever wielded the knife, much less committed the stabbing. On the other hand, the knife was used frequently by Carl, another resident of the apartment who was present during the fight. According to trial counsel, Carl's "evasive" and "dishonest" behavior following the crime was designed to avoid "revealing his own involvement in the stabbing." Just one day later, however, and following a failure to present an affirmative defense case, trial counsel conceded in his closing argument that defendant "committed the crime [of voluntary manslaughter] on April 23, 2016," but maintained that defendant was not guilty of first or second degree murder. The jury disagreed, finding defendant guilty of first degree murder (§ 187, subd. (a)) and declaring true the special allegation that he used a knife (§ 12022, subd. (b)).

When defendant next appeared in court at his June 16, 2017 sentencing hearing, defendant maintained that the stabbing had really been committed by Carl. Following an off-the-record discussion and subsequent colloquy intended to confirm that there were no pending issues precluding the pronouncement of judgment, a disagreement arose between defendant and his counsel over whether to file a new trial motion. Upon learning of his right under *Marsden* to seek new counsel, defendant made a motion to replace his attorney.

At the *Marsden* hearing, defendant raised three principal complaints: (1) his disagreement with trial counsel concerning his factual innocence defense; (2) issues related to search and seizure not relevant here; and (3) trial counsel's alleged refusal to

5

allow defendant to testify in his own defense. Ultimately, the trial court denied defendant's *Marsden* motion. We briefly discuss defendant's first and third arguments.

1. *The Factual Innocence Defense*

At the *Marsden* hearing, defendant informed the court he wanted a new attorney "because we had disagreed on his argument, for one, like I mentioned earlier, about the evidence pointing to another person. And he had said he felt this was my best shot asking for manslaughter, which wasn't the case since I'm not guilty of this crime."

In response, his trial counsel stated: "The closing argument in this case, the tactic that I chose to take was to argue for . . . voluntary manslaughter. This was an issue that was discussed with not just [defendant], it was addressed, discussed before it was made with . . . the head public defender [and] with my chief investigator, who has been an investigator for 45 years, who was extensively involved in this case. . . . We staffed this several times trying to decide what is the best closing argument in this case, whether it's to go for voluntary manslaughter and argue that, or argue that [defendant] didn't commit the crime at all. We were trying to decide which would be the best tactic."

"I think the day prior to making the argument, I know [defendant] and I discussed it. I know what he wanted to go forward with, I didn't do it. However, I know that after [we] spoke I was in a jury instruction conference with the Court, I know he met with my chief investigator. The word I received was he agreed with this. The day we were making the closing argument, [defendant] was waffling a little bit. [¶] At that point[,] I was committed to making the closing argument that we're going to go for the voluntary manslaughter. I understand [what] his position was, but that was the best—in my professional opinion that was the best tactic that was going to obtain the best result for [defendant]."

In rebuttal, defendant reiterated that counsel acted contrary to his wishes and instructions, stating: "I wanted to substantiate, you know, me not doing—committing this crime, whereas he turned around and was asking for manslaughter, telling them I had

6

committed the crime. . . . [¶] . . . [¶] I advised him not to go that route, and he had done it anyway." Defendant also stated, "From the get-go, I was arguing from the very, very get-go from the first, none of his blood was on me. There's no trace evidence, my prints nor my DNA was on the knife, and he was wanting to take a different route. It was almost as if I felt at times he thought I was guilty."

Defense counsel did not deny that he conceded guilt in his closing argument notwithstanding defendant's desire to maintain his innocence. Instead, he said: "I do want to point out on the closing argument I wasn't just looking at the DNA not found on the knife. I had to look at the totality of the evidence that was presented that I had in making that decision, and that was the basis of my decision to go forward with the closing argument that I did, was the basis of the totality of the evidence and what was going to be the best possible result, I believe, with the jury."

### 2. *The Right to Testify*

During the *Marsden* hearing, defendant also complained that his counsel had not let him testify: "I wanted to take the stand, which he advised against, *would not let me*. And I thought, you know, I would be able to get to tell my whole story and whatnot instead of just answering questions." (Italics added.) He reiterated this later, stating, "And I really wanted to take the stand and tell my side of the story." Counsel never responded to this assertion, nor did the court request that counsel address it before stating they would never know whether testifying would have been helpful to defendant's case, and that "attorneys have to make decisions based upon the best information that they have at the time of the case."

### B. *The Law*

The Sixth Amendment guarantees criminal defendants the right to assistance of counsel in his or her defense. (*McCoy*, *supra*, 548 U.S. at p. ___ [200 L.Ed.2d at p. 829].) As explained in *McCoy*, " '[t]he right to defend is personal,' and a defendant's

7

choice in exercising that right 'must be honored out of "that respect for the individual which is the lifeblood of the law." ' [Citations.]

"The choice is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel. For the Sixth Amendment, in 'grant[ing] to the accused personally the right to make his defense,' 'speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant.' [Citations.] Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' [Citation.] Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. [Citation.]

"Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*. [Citations.]" (*McCoy*, *supra*, 584 U.S. at pp. ___ [200 L.Ed.2d at pp. 829-830].)

Thus, *McCoy* recognized that even in the face of counsel's better judgment and experience, "[w]hen a client expressly asserts that the objective of '*his* defen[s]e' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*McCoy*, *supra*, 584 U.S. at p. ___ [200 L.Ed.2d at p. 831].) *McCoy* therefore held: "[A] defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Guaranteeing a defendant the right 'to have the *Assistance* of Counsel for *his* defen[s]e,'

8

the Sixth Amendment so demands. With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*Id.* at p. ___ [200 L.Ed.2d at p. 827].)

A violation of the client's right to maintain his or her defense of innocence implicates the client's autonomy (not counsel's effectiveness) and is thus complete once counsel usurps control of an issue within the defendant's "sole prerogative."[5] (*McCoy*, *supra*, 584 U.S. at p. ___ [200 L.Ed.2d at p. 833].) *McCoy* held that error of this kind is structural and not subject to harmless error review because it "blocks the defendant's right to make fundamental choices about his own defense" and "the effects of the admission would be immeasurable." (*Id.* at p. ___ [200 L.Ed.2d at p. 834].)

C.      *Analysis*

Here, defendant argues his counsel's concession during closing arguments that he committed manslaughter violated his Sixth Amendment right to maintain his absolute innocence. We agree that *McCoy* protects defendant's right to determine that the objective of his defense is innocence and conclude, on this record, that the rule announced in *McCoy* applies here.

The defendant in *McCoy*, accused of murdering three individuals, at all times maintained his factual innocence of the crimes, asserting he was out of state at the time of the killings. (*McCoy*, *supra*, 584 U.S. at p. ___ [200 L.Ed.2d at p. 827].) In spite of this,

---

[5] Although *McCoy* observes that "the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative" (*McCoy, supra*, 584 U.S. at p. ___ [200 L.Ed.2d at p. 833]), we do not believe that judicial assent is necessary to establish a violation of the Sixth Amendment right. This statement merely reflects that the defendant in *McCoy* objected during the opening statement and was admonished by the court, who allowed defense counsel to continue. (*Id*. at p. ___ [200 L.Ed.2d at p. 828].)

defense counsel conceded at trial that the evidence would show that defendant killed the victims (*id*. at pp. \_\_\_\_ [200 L.Ed.2d at pp. 828-829]), arguing only that the defendant did not commit first degree murder. (*Id.* at pp. \_\_\_ [200 L.Ed.2d at pp. 834-835] (dis. opn. of Alito, J.).) After objecting at trial, defendant argued unsuccessfully in a new trial motion that his attorney's concession of guilt violated his constitutional rights. (*Id.* at p. \_\_\_ [200 L.Ed.2d at p. 829].) The trial court's decision was affirmed by the Louisiana Supreme Court on the ground that defense counsel had authority to concede guilt "because counsel reasonably believed that admitting guilt afforded McCoy the best chance to avoid a death sentence." (*Ibid*.) The Supreme Court of the United States granted certiorari to determine "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection." (*Ibid*.) As noted above, *McCoy* held that an attorney must abide his client's expressed objective of innocence, even if pursuing that defense is against that attorney's better judgment and experience. (*Id.* at pp. \_\_\_, \_\_\_ [200 L.Ed.2d at pp. 827, 829-833].)

The People counter that *McCoy* is distinguishable because defendant did not consistently maintain his right to an innocence defense, did not complain about counsel's argument until after he was convicted, and did not present a complete alibi defense. We disagree.

The *Marsden* hearing record establishes that trial counsel knew that defendant did not agree with the strategy of conceding manslaughter in closing argument, even if defendant had temporarily acquiesced to the strategy.[6] The People make much of

_____

[6] Even if defendant had told an investigator that he would go along with the manslaughter concession strategy, that would not divest him of the fundamental right articulated in *McCoy*. The People have provided no authority suggesting temporary acquiescence would abrogate the right, and we are similarly unpersuaded that briefly acquiescing to counsel's strategy outside of court, but then retracting the concession before the closing argument, is analogous to the defendant in *Florida v. Nixon* (2004) 543 U.S. 175, 185-186 [160 L.Ed.2d 565, 577], who declined to participate in any aspect

10

counsel's statement that defendant was "waffling a little bit" on the day of closing argument, suggesting that defendant did not unequivocally retract his alleged concession and was "inconsistent" in his defense strategy.[7] However, that statement must be taken in context, and in context it is clear counsel was instructed not to make the argument but did so anyway because of counsel's judgment that it was in defendant's best interests.

Counsel stated: "I think the day prior to making the argument, I know [defendant] and I discussed it. *I know what he wanted to go forward with, I didn't do it*. However, I know that after [we] spoke I was in a jury instruction conference with the Court, I know he met with my chief investigator. The word I received was he agreed with this. The day we were making the closing argument, [defendant] was waffling a little bit. [¶] At that point[,] I was committed to making the closing argument that we're going to go for the voluntary manslaughter. *I understand* [*what*] *his position was*, but that was the best—in my professional opinion that was the best tactic that was going to obtain the best result for [defendant]." (Italics added.)

In his testimony at the *Marsden* hearing, defendant made clear that he had instructed his counsel not to concede manslaughter and that counsel had overridden this directive: "I wanted to substantiate, you know, me not doing—committing this crime, whereas he turned around and was asking for manslaughter, telling them I had committed the crime. . . . [¶] . . . [¶] *I advised him not to go that route, and he had done it anyway*." (Italics added.) Although counsel reiterated that he did what he thought was

___

of his defense and objected only after he was found guilty. (*McCoy*, *supra*, 584 U.S. at p. ___ [200 L.Ed.2d at p. 831].)

[7] The People's suggestion that *McCoy* should be distinguished because defendant purportedly failed to oppose defense counsel's strategy throughout the trial ignores that the trial proceeded on an innocence theory and that counsel's decision to make a manslaughter concession occurred shortly before closing arguments. We cannot fault defendant for failing to object earlier to a decision that was made without notice one day before closing arguments.

11

best given the totality of the evidence, a proposition that is not in question, he did not deny that he received this instruction before he gave his closing argument. Accordingly, we find the record establishes that defendant instructed his counsel to maintain his innocence before the closing argument and that this instruction was not honored.

Further, while defendant did not object during closing argument after his counsel conceded his guilt of voluntary manslaughter, we do not think preservation of the Sixth Amendment right recognized in *McCoy* necessarily turns on whether a defendant objects in court before his or her conviction. Rather, the record must show (1) that defendant's plain objective is to maintain his innocence and pursue an acquittal, and (2) that trial counsel disregards that objective and overrides his client by conceding guilt. (*McCoy*, *supra*, 584 U.S. at pp. ___, ___ [200 L.Ed.2d at pp. 827, 829-833].) Although such evidence may come in the form of a defendant objecting during argument, on this record we conclude *McCoy* applies here.

We also disagree with the People that defendant's defense theory (that someone else killed the victim) is sufficiently distinguishable from the defendant in *McCoy* who advanced an alibi defense. Both defenses are rooted in factual innocence. (See *McCoy*, *supra*, 584 U.S. at pp. ___ [200 L.Ed.2d at pp. 832-833] [concurring with cited state supreme court cases recognizing a right to maintain the fundamental objective of the defense was factual innocence over counsel's desire to concede commission of criminal acts and pursue defenses of "diminished capacity, mental illness, or lack of premeditation"].)

We also find it unnecessary that defendant actually testify in his own defense in order to enjoy *McCoy*'s protection. The People have provided no authority establishing that defendant's failure to testify divested him of his fundamental right to maintain

12

innocence as the objective of his defense.[8]  Authorities discussing the "reasonableness"

of counsel's defense strategy given the state of the evidence miss the mark.[9]  (See, e.g.,

*People v. Welch* (1999) 20 Cal.4th 701, 728-729 [counsel not ineffective for pursuing

lack of premeditation instead of innocence in the face of overwhelming evidence].)

Whether defendant has been deprived of his fundamental right to maintain innocence as

the object of his defense (a right founded in autonomy) does not turn on the

reasonableness of counsel's conduct.  (*McCoy*, *supra*, 584 U.S. at p. ___ [200 L.Ed.2d at

p. 833].)

We conclude that defendant has established a violation of his right to decide the

objective of his defense under *McCoy*, and because this violation constitutes structural

error (*McCoy*, *supra*, 584 U.S. at p. ___ [200 L.Ed.2d at p. 833]), reversal of his first

degree murder conviction is required.  The parties do not address *McCoy*'s application to

the jury's finding on the knife enhancement, but because the enhancement is premised

upon defendant's use of a knife in the commission of a felony (§ 12022, subd. (b)), i.e.,

the stabbing trial counsel conceded defendant committed, we conclude that *McCoy*

requires reversal of the enhancement finding as well.

---

[8]  Nor do we think it should, as such divestiture would undermine defendant's separately protected right to remain silent.  (U.S. Const., 5th & 14th Amends.)

[9]  Even if we were to assume a need for some credible evidence in the record supporting defendant's requested defense (see *People v. Frierson* (1985) 39 Cal.3d 803, 812, 815, fn. 3 [because there was credible evidence, the court declined to decide "whether a defendant has a constitutional right to insist on the presentation of a defense which has no credible evidentiary support or on which no competent counsel would rely"]), here, there was such evidence.

## DISPOSITION

The judgment is reversed and the matter remanded for proceedings consistent with this opinion.

        KRAUSE        , J.

We concur:

        BLEASE        , Acting P. J.

        MAURO        , J.