Filed 5/22/20

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D074240 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD266518 ) |
| JOSHUA M. PALMER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge. Affirmed as modified; remanded with directions.

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott Taylor, and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joshua M. Palmer of first degree murder (Pen. Code,[1] § 187, subd. (a).) The jury also found true the allegations that Palmer committed the murder while engaged in the commission or attempted commission of rape (§ 261), sodomy (§ 286), and sexual penetration by force, fear, or threat (§ 289).

The court sentenced Palmer to prison for life without the possibility of parole.

Palmer appeals, contending he is entitled to a new trial under *McCoy v. Louisiana* (2018) ___ U.S. ___, 138 S.Ct. 1500, 200 L.Ed.2d 821 (*McCoy*), which prohibits counsel from conceding guilt when a defendant insists on maintaining innocence. He also claims he is entitled to an additional 10 days of custody credit.

We reject Palmer's argument that he is entitled to relief under *McCoy*, *supra*, ___ U.S. ___, 138 S.Ct. 1500. Unlike the defendant in *McCoy*, Palmer did not expressly state his desire to assert his innocence. However, as the People concede, Palmer is entitled to an additional 10 days of custody credit. Except for instructing the trial court to amend the abstract of judgment to capture the additional 10 days of custody credit, we otherwise affirm the judgment.

## FACTUAL BACKGROUND

Palmer and S.H. worked at a restaurant together in April 2016. Palmer was interested in S.H. romantically, but she did not reciprocate his feelings. Palmer was frustrated because he wanted to have sex with S.H., but she was not open to that kind of

---

[1] Statutory references are to the Penal Code unless otherwise specified.

relationship. S.H. shared a text Palmer wrote to her with a friend. Palmer wrote, "If I can't have you the way I want you, I'm afraid I'll do something I'll regret."

S.H. had been planning to move out of her mother's house due to problems at home. She intended on living with Palmer in his room at the Chadwick Hotel, located in downtown San Diego. She had been staying with him intermittently for about two weeks. Palmer told a friend that if S.H. "didn't start putting out," she was going to have to leave.

Text messages reveal that some disagreement occurred between Palmer and S.H. on April 4, 2016. Palmer wrote:

> "I don't know what you think happened but I didn't touch you inappropriately, I moved you around . . . . I wouldn't take a chance of losing you by touching you. I didn't take any pictures. I'm sorry if I made you uncomfortable."

Palmer continued to text S.H. insisting he did not disrespect her and did not touch her in a sexual manner. Rather, he just moved her body to snuggle up next to her. He felt she was overreacting.

Later that same night, Palmer and S.H. met up at a downtown barbeque restaurant they frequented. At some point, S.H. left. Palmer remained there and flirted with a girl he knew, C.S. They were drinking heavily. C.S. left with Palmer and went back to the Chadwick Hotel with him between 1:30 a.m. and 2:00 a.m. on the morning of Tuesday, April 5. Once back at his room, they started to engage in sexual activity, but it did not last long because Palmer could not maintain an erection.

3

Meanwhile, S.H. met A.K., after she left Palmer at the restaurant. She brought him back to Palmer's room at about 1:55 a.m. When they got to the room, A.K. saw there were two other people already there, Palmer and C.S. While Palmer and C.S. were in the room, A.K. and S.H. started kissing and having sex. C.S. joined them and had oral sex with S.H., while A.K. had sex with C.S. Palmer stood in the room and watched them for about 10 to 15 minutes. As he was watching, Palmer texted S.H., "No that's not cool I'm sorry I can't do this," and "I'm going to go and kill myself enjoy thank you for destroying any hope I had." Palmer then told everyone to "get out." It took C.S. and A.K. a few minutes to get dressed, and they left, but S.H. stayed.

Palmer continued to send text messages to S.H. after C.S. and A.K. left, beginning at 2:49 a.m. through 2:56 a.m. At 2:49 a.m., Palmer texted, "I'm sorry I love you I accepted my place as a friend but I can't watch you make love to someone else, I know it's selfish but I can't take it, I'm not good enough but two total strangers are? It just destroyed me!" One minute later, he wrote, "I choose you I always will." Seconds later, he texted, "I'm sorry." At 2:51 a.m. he sent S.H. the message: "God please understand I'm sorry." Then, minutes later, he texted: "I've Never [*sic*] wanted anything more in my life then the way I want you. You don't want me! I get it, it hurts because I'm so much better than the other people in your life. It's total rejection!"

At about 3:44 a.m., Palmer recorded a video stating, "I just slit my wrist. I'm using this moment or two that I have to say goodbye. To say, 'I'm sorry.' I let a lot of people down. I tried to be good, but I wasn't good enough. . . . I'm sorry."

4

Then at 4:31 a.m., Palmer texted S.H., "I'm sorry please be safe on your way home, hate me fine but at least be safe ok!  Let me know when you get home."  He then later thanked her for sleeping with him, apologized because she was now uncomfortable, and told her he loved her.  At 6:02 a.m., a message was sent from S.H.'s phone that said, "I had fun im [*sic*] not uncomfortable around you any more [*sic*].  I'm almost home.  I don't want to talk to you any more over text.  Bye."

Palmer sent a text to S.H.'s phone in response, saying that he was in love with her and did not like C.S. and A.K. touching her.  He hoped that things would not change between them, and he would talk to her later.

That morning, Palmer also texted C.S.  He apologized for having kicked her out of his room but told her he ended up having sex with S.H., who left because she was scared of falling in love with him and never wanted to see him again.  That day, Palmer also met up with a friend of his and told her that he had a foursome with S.H., C.S., and another guy.  He said he had anal sex with S.H., and she left his room upset.  He said he was going to make sure S.H. went to work over the next few days to ensure she was alright.  Palmer continued to send text messages to S.H.'s phone that day.

The next morning, Wednesday April 6, one of the residents of the Chadwick Hotel who helped take out and bring in the trash bins, noticed that one of the bins he was putting away was heavy.  He saw it had a suitcase in it.  Because the trash bin had been marked as defective, it was not picked up by the sanitation workers as scheduled that day.  The resident put the bin aside.

Later, another resident of the hotel noticed that the bin was out of place and saw a suitcase on the ground next to it. On closer examination, he observed hair coming out of the seams of the suitcase, human flesh, and insects. He called the police.

The first officer to arrive examined the suitcase and saw hair and a human foot. Upon unzipping the suitcase, he saw a young female's body inside of it. A closer examination revealed that the woman had been dead for some time.

Also on that day, Palmer reached out to a friend to express his concern that S.H. was missing and told the friend what had happened the night before. The friend told him to call the police, but Palmer declined to call until he verified S.H. did not show up at work. Palmer continued to text S.H.'s phone, stating he was worried about her after learning that a body was found outside his building. He also expressed his concerns to others.

As police were processing the scene, at 5:00 p.m., Palmer called 911 to report S.H. missing. In the call, he told the dispatcher he had last seen S.H. on Tuesday at 4:30 a.m., when she left his room naked, wrapped in a blanket, with a nosebleed after a "very unique event" emotionally disturbed her. He stated that no one had heard from her since then, and he was concerned after having seen the news report of a girl found in a suitcase where he lived.

Based on Palmer's 911 call referencing S.H., police were able to identify the body found in the suitcase as hers. Once police ascertained the body was S.H.'s, they contacted Palmer, and he voluntarily went to the police station to be questioned about his missing person's report. Palmer was interviewed three times, offering very different versions of

6

events on each occasion. During the first interview, the detective noted Palmer had injuries to his hands and was sniffing a lot, which was consistent with cocaine use.

In his first interview, taken on the evening of Wednesday April 6, Palmer explained that S.H. was his girlfriend, even though she considered him to be like a brother or a friend. On Monday night, they were involved with a foursome with A.K. and C.S. S.H. was drunk and high on cocaine at the time. When A.K. and C.S. left, he and S.H. had consensual oral, vaginal, and anal sex. She cried afterward because she was uncomfortable. She wanted to leave because boundaries had been crossed. She wrapped herself in a blanket, grabbed her backpack, and left. When she left, she had a nosebleed from having snorted cocaine. According to Palmer, S.H. texted him at about 6:00 a.m., telling him that she had fun but was uncomfortable and needed some space. Not having heard from S.H., Palmer said he freaked out when he learned that a body was found in a suitcase near his residence.

Palmer was interviewed a second time late in the evening of April 6, into the early hours of Wednesday, April 7. He admitted he became enraged watching S.H. having sex with A.K. and C.S. After he had sex with S.H., he took his phone out and videotaped her sleeping naked. She caught him when she woke up and was angry. She punched the wall in anger, breaking the skin on her knuckle. She took his phone and deleted the pictures. She then grabbed her clothes and went home.

After Palmer gave his two interviews, an autopsy was performed. The autopsy revealed that S.H. died of strangulation. Death by strangulation usually requires continuous pressure to the neck for three to five minutes. An examination of S.H.'s body

7

revealed blunt force trauma to her mouth, skull, and rectum. S.H.'s other injuries included bruising to her shoulders and legs as well as abrasions to her hands. A toxicology report revealed she had no alcohol or drugs in her system.

Palmer was arrested on Friday, April 8, and consented to another interview. He accused S.H. of brandishing a buck knife at him when she caught him videotaping her. He grabbed her and got the knife away from her. She ordered him out of the room, and he went to the bathroom for 20 minutes. When he came back in the room, he found her body hanging from the ceiling fan with a phone charger cord. She was dead when he discovered her. He was angry at her for killing herself, so he punched her in the jaw after she was dead. He also laid on top of her, kissed her, and choked her after he found her dead. He was too scared to call medics and sent himself the message from S.H.'s cell phone at 6:00 a.m. In a panic, he threw away her phone, put her body in a suitcase, and placed the suitcase in a trash bin.

After being confronted with problems with his story, Palmer then stated that he put S.H. in a choke hold after she brandished a knife at him. She was angry and violent about the video, so he put a choke hold on her for 45 seconds to a minute. She fought him but then just stopped. She was still breathing when he released her. But then she stopped breathing, and he tried to perform CPR. He punched her for making him kill her. It was an accident. He did not mean to kill her.

Forensic evidence linked Palmer to S.H.'s murder. Blood stains matching S.H.'s DNA were found in Palmer's room. Palmer's DNA was found on S.H.'s genitals. A forensic analysis of Palmer's phone located five deleted videos recorded on April 5,

8

between 2:25 a.m. and 6:53 a.m. Three of the videos showed Palmer digitally penetrating S.H.'s anus and vagina when she was deceased.

DISCUSSION

I

PALMER'S TRIAL COUNSEL'S CONCESSION THAT HE COMMITTED MANSLAUGHTER

A. Palmer's Contentions

Palmer maintains that his trial counsel's strategic decision to concede that Palmer was guilty of voluntary manslaughter violated his rights under the Sixth and Fourteenth Amendments to choose the objective of his defense. (See *McCoy*, *supra*, ___ U.S. ___, 138 S.Ct at p. 1505; *People v. Eddy* (2019) 33 Cal.App.5th 472, 481-482 (*Eddy*).) Palmer claims that he wanted his trial counsel to put on a defense of factual innocence, and she violated his right to choose the objective of his defense. Because we find that *McCoy* and *Eddy* are factually distinguishable from the instant matter, we reject Palmer's contention.

B. Background

During her opening statement, Palmer's trial counsel told the jury that Palmer became heartbroken when he saw S.H. having sex with A.K. and C.S. in front of him. She then told the jury that what happened after A.K. and C.S. left, however, was in dispute and the prosecution's theory would be based on speculation. Defense counsel also stated that there was no evidence that Palmer had sex with S.H. without her consent. She also warned the jury that they would see video evidence that showed Palmer sexually

9

touching S.H. after she died.  In addition, although Palmer's actions after S.H. died were concerning, they were the result of Palmer's panic, not guilt.  Counsel urged the jury not to be swayed by anger or emotion.  She maintained that the prosecution would not meet its burden and the jury would find Palmer not guilty of first degree murder and find the sexual abuse allegations untrue.

About midway through the trial, Palmer's trial counsel alerted the court she had received a letter from Palmer indicating he was considering a "potential *Marsden* hearing."[2]  Since receiving the letter, however, Palmer told her that he did not want to pursue the hearing.  Defense counsel nevertheless wanted to bring the matter to the court's attention.  The court asked Palmer whether he wanted a hearing, and he responded that he did not.

During closing argument, Palmer's trial counsel disputed that the evidence showed that Palmer raped, sodomized, or sexually penetrated S.H.  Defense counsel argued that the physical evidence did not show any trauma consistent with rape and evidence of multiple DNA contributors were found on S.H.'s body.  Although witnesses testified that S.H. was not romantically interested in Palmer, counsel pointed out that none of those witnesses knew what happened between Palmer and S.H. on the night in question.  In fact, S.H. was willing to participate in group sex that night, and Palmer was not precluded from participating.  Further, the video evidence showed Palmer engaged in sexual acts with S.H. after her death, not before.

---

[2]     See *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

Palmer's trial counsel argued it was a reasonable interpretation of the evidence that either Palmer and S.H. had sex consensually or that any sexual activity occurred after she died. Defense counsel also addressed the first degree murder charge. She argued that the evidence did not show intent to kill.

Indeed, because Palmer was drunk, counsel asserted that Palmer was unable to carefully weigh his decisions and premeditation was negated on that basis.

Also, because the situation was chaotic, counsel noted that Palmer did not take the time to contemplate his decision as things were happening. She also pointed out that provocation lessened first degree murder to second degree murder or manslaughter because it would mean any decision was not calculated. Palmer's trial counsel argued provocation existed here because Palmer was sexually humiliated, he could not satisfy the girl he brought home, and then S.H., the woman he loved, participated in sexual activity with strangers, not only in his room but in his bed. In light of those circumstances, Palmer's trial counsel argued Palmer was not thinking clearly but, instead, was acting emotionally. Therefore, Palmer acted in the heat of passion. Defense counsel concluded by stating that the evidence supported a conviction of voluntary manslaughter and urged the jury to find Palmer not guilty of all other charges. However, the jury found Palmer guilty of first degree murder.

Before sentencing, Palmer requested a *Marsden* hearing. In the closed hearing, Palmer asserted that his attorney "did not present a defense that was the truth and was against my earnest will to present." He claimed to have argued with her about it because he wanted to present "the truth." He complained that counsel argued that he killed S.H.

11

in a heat of passion, when he did not. When the court inquired why he killed her, he stated that he did not kill her. He clarified that her death was his fault, but it was not intentional. Rather, it was an accident that occurred during "a taboo sexual act."

Prior to the *Marsden* hearing, defense counsel had explained to Palmer that his theory was not something she was able to validate or prove. Counsel told the court that she retained an expert who found that the autopsy findings did not corroborate Palmer's story in light of the pressure and time required to break the hyoid bone in the neck. She did not consider it a viable defense because she had no expert to corroborate Palmer's assertion.

The court explained to Palmer that his attorney was bound by the facts and was not a "magician" who could "produce evidence that is not there." Given that S.H. was strangled and the time required to kill someone that way, presenting his story without any medical basis would have been "ludicrous." Instead, there was one course to pursue, namely, that he had consensual sex with S.H. and the crime itself was either second degree murder or voluntary manslaughter. The court also noted that because Palmer lied to police, his attorney was "backed into a corner." The court observed it was aware of defendants in Palmer's position who tried to blame someone else for a bad result at trial. However, the court explained that Palmer's trial counsel took "every opportunity to defend" him and "pursued every avenue." The court told Palmer that asserting that the killing occurred by erotic asphyxiation would have been "counterproductive."

Defense counsel stated that she advised Palmer that he should not testify at trial because of all the damaging evidence that was presented. She informed the court that

12

Palmer told her that he was going to follow her advice not to testify. In response to defense counsel's representation, the court and Palmer engaged in the following exchange in which the court sought to explain to Palmer why his attorney recommended that he not testify at trial:

"THE COURT: Right. And your inability to explain your repeated lies to law enforcement, sir, over the course of all these interviews and your changing story.

"[Palmer]: I'm sorry. It wasn't an inability. It wasn't lack of opportunity. I wanted to testify. I am willing to take full responsibility for what I did do. I am not trying to hide anything. But I did not rape and I did not murder her. I did not want her to present this defense. Even Thursday morning of that trial you asked me if I wanted a *Marsden* hearing because I—almost requested because I did not want her to proceed with the defense she was offering. [¶] The fact that I had sexual relationships with her body after she was deceased is something I did not do and, in my mind, the most disgusting thing possible. The fact that she said I killed her in a heat of passion, which is not what happened.

"THE COURT: Okay. I understand, sir. But when I asked you if you wanted the *Marsden*, you said you did not.

"[Palmer]: Right.

"THE COURT: Okay. So there you have it. [¶] And I just don't know—you must have forgotten that at the end you admitted to the officer, to the detective, that you had strangled her. And you said—you didn't say a word to the officer about it's because she wanted me to erotically asphyxiate her.

"[Palmer]: Right.

"THE COURT: So, again, this defense would have been 100 percent inconsistent with the physical evidence, medical evidence, and your own confession.

13

"[Palmer]: And the lie that I told the cops was that I killed her accidentally during an argument in which she was trying to hurt me with a knife in self-defense.

"THE COURT: Right.

"[Palmer]: I understand that I have or did repeatedly lie to the police, gave them multiple different statements.

"THE COURT: Okay.

"[Palmer]: Right.· I gave [my attorney] multiple different statements.

"THE COURT: Okay.

"[Palmer] Okay. I understand that it is wrong. I—at this point I have nothing to hide. I have nothing to run from. And like I said, I am willing to take full responsibility for what I've done."

The court subsequently stated, "The record . . . is clear, sir, that now you wish that you had done a different strategy and that you will have a different attorney on appeal in the case." The court declined to remove counsel from the case noting counsel had made a "valiant effort," a sentiment Palmer did not "deny . . . at all." Nonetheless, Palmer asserted that a month before trial, he told his counsel he wanted to testify. According to Palmer, counsel responded that it was his right to do so, but if he chose to testify, she was not going to help him, and it would be his job to defend himself. He felt she had used coercion and fear to force him to relinquish his right to testify and tell the truth.

In response to Palmer's accusation, defense counsel denied that she told Palmer she would not help him if he wanted to testify. Instead, she asked Palmer to give her notice if he planned to testify so she could prepare how best to handle it. According to counsel, Palmer told her he would think about it and then called her later to tell her he

14

was going to take her advice and not testify. At that time, she advised him again that it was absolutely his right, and although she was in charge of strategy decisions, whether he testified at trial was not one of them.

In addition, defense counsel expressed her concern to Palmer about being confronted with the video of him with S.H.'s body, which she did not believe would go over well with the jury. He had offered counsel multiple explanations, including he had taken the video to masturbate to later and that he was using his finger to dispose of the DNA he had deposited in her. She also was concerned that Palmer might open the door during cross-examination to introduce other videos, which had been previously excluded. Counsel also noted that she received "a variety of stories" from Palmer over the years she represented him.

The court concluded by stating that it had given the defense time to look into other defenses, and in this case, it would not have been to his advantage to proceed with the erotic asphyxiation theory. The court noted:

> "And this is not a time for Monday morning quarterbacking and saying what if she had presented X or Y. She presented what she thought gave you the best chance of beating the life without possibility of parole allegations, and that's the approach she took, which I think was absolutely the most viable defense in this case given the state of the evidence."

Ultimately, the court denied the motion and indicated the issue had been preserved for appeal.

15

C.  Applicable Law and Standard of Review

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215; accord, *McCoy*, *supra*, ___ U.S. ___, 138 S.Ct. at p. 1507.)  Generally, "[t]rial management is the lawyer's province:  Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'  [Citation.]  Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to jury trial, testify in one's own behalf, and forgo an appeal."  (*McCoy*, at p. 1508; accord, *People v. Frierson* (1985) 39 Cal.3d 803, 812 [counsel has "traditional power to control the conduct of the case" but "with respect to certain fundamental decisions in the course of a criminal action, a counsel's control over the proceedings must give way to the defendant's wishes"].)  When counsel overrides a defendant's autonomy on a fundamental decision that is reserved for the client, the defendant's Sixth Amendment rights are violated.  (*McCoy*, at pp. 1507-1508.)  "A violation of the client's right to maintain his or her defense of innocence implicates the client's autonomy (not counsel's effectiveness) . . . ."  (*Eddy*, *supra*, 33 Cal.App.5th at p. 480.)  Accordingly, such an error is structural and not subject to harmless error review.  (*McCoy*, at p. 1511.)

We review the legal question of whether defendant's constitutional rights were violated de novo.  (See *People v. Cromer* (2001) 24 Cal.4th 889, 894.)

D.  Analysis

In support of his assertion his counsel improperly conceded guilt, Palmer primarily relies on *McCoy*, *supra*, ___ U.S. ___, 138 S.Ct. 1500, in which the court held defense counsel's concession of his client's guilt to the jury violated the defendant's constitutional rights.  There, defense counsel informed him two weeks before trial that he intended to concede the defendant's commission of a triple murder because the evidence against him was overwhelming and without a concession at the guilt stage, a death sentence at the penalty phase would be impossible to avoid.  (*Id.* at p. 1506.)  The defendant told counsel he did not want him to concede guilt, and counsel was aware of the defendant's opposition to counsel's strategy.  The defendant insisted counsel pursue acquittal.  Two days before trial, the defendant sought to terminate his counsel's representation.  The trial court denied that request.  At the commencement of defense counsel's opening statement, he conceded defendant's guilt.  Out of earshot of the jury, the defendant protested, telling the court that counsel was " 'selling [him] out.' "  (*Ibid*.)  The defendant testified, proclaiming his innocence and pressing an alibi.  During closing argument, defense counsel reiterated that the defendant was the killer.  The jury returned a guilty verdict of first degree murder on all three counts.  Once again, in the penalty phase, counsel conceded the defendant committed the crimes.  The jury returned three death verdicts. (*Id.* at p. 1507.)

The United States Supreme Court reversed the conviction, concluding that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best

17

chance to avoid the death penalty." (*McCoy*, *supra*, ___ U.S. ___, 138 S.Ct. at p. 1505.) The court reasoned that while trial management is the lawyer's province to make decisions regarding arguments to pursue, evidentiary objections to raise, and agreements to make concerning the admissibility of evidence, some decisions are reserved for the client—"notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Id.* at p. 1508.) A defendant, according to the court, has the autonomy to assert his innocence. (*Ibid*.) And counsel may not admit a client's guilt of a charged crime "over the client's intransigent objection to that admission." (*Id.* at p. 1510.)

In reaching its conclusion, the Supreme Court distinguished the defendant's situation in *McCoy* from *Florida v. Nixon* (2004) 543 U.S. 175, clarifying that in contrast to the defendant's adamant objections to any admission of guilt in *McCoy*, Nixon never approved or protested counsel's admission of his guilt at trial, and thus his autonomy was not negated. In fact, Nixon did not complain about the admission of guilt until after trial. (*McCoy*, *supra*, ___ U.S. ___, 138 S.Ct. at pp. 1505, 1509.)

The instant matter is not like *McCoy*. Unlike the defendant in *McCoy*, who emphasized, both before and during trial, that that he wanted to proclaim his innocence, there is nothing in the record that indicates Palmer told his trial counsel that he wanted to assert his innocence before or even during trial. At most, he wanted to argue that the victim died after a "taboo sex act" (erotic asphyxiation) went wrong. The record here shows that when his attorney told Palmer that the evidence did not support such a theory, Palmer relented, decided not to testify, and refused a *Marsden* hearing in the middle of

18

trial when the court asked him if he wanted one.  In contrast, the defendant in *McCoy* claimed that he was innocent the entire time, sought to get new counsel before the start of trial, and testified during trial that he was innocent.  (See *McCoy, supra*, ___ U.S. ___, 138 S.Ct. at pp. 1506-1507.)

In the instant matter, although declining to testify during trial or have a *Marsden* hearing before closing argument, Palmer only complained about defense counsel's representation after the jury returned a guilty verdict.  Moreover, he admitted to telling his attorney multiple stories about what happened with the victim.  Thus, Palmer conceded that he was not consistently telling his attorney that he was innocent and wanted to present an innocence defense.  At best, Palmer presented multiple explanations of what occurred to his attorney (as well as to law enforcement) that only muddied the waters of his defense.  Put differently, this is not a case like *McCoy* where the defendant emphatically insisted he was innocent and consistently told his attorney to argue such at trial.

Additionally, *Eddy*, *supra*, 33 Cal.App.5th 472 is no help to Palmer.  In that case, applying *McCoy*, the appellate court determined the defendant's right to counsel had been violated by his counsel's admission of the defendant's guilt in closing argument.  In *Eddy*, defense counsel presented an innocence defense during his opening statement, and the defendant did not testify at trial.  (*Eddy*, at pp. 477, 479.)  One day later, after failing to present an affirmative defense, trial counsel conceded in closing argument that the defendant had committed a lesser included offense but was not guilty of the greater offenses.  (*Id.* at p. 477.)  During a posttrial *Marsden* hearing, defense counsel admitted

19

he knew his client wanted to go forward with an innocence defense, but explained he was committed to making the closing argument conceding guilt on the lesser offense. In counsel's opinion, concession was the best tactic. (*Eddy*, at p. 478.) The defendant told the trial court that he advised counsel " 'not to go that route, and he had done it anyway.' " (*Id*. at pp. 478-479.) The appellate court, consistent with *McCoy*, concluded: "The *Marsden* hearing record establishes that trial counsel knew that defendant did not agree with the strategy conceding manslaughter [(a lesser included offense of murder)] in closing argument . . . . [I]n context it is clear counsel was instructed not to make the argument but did so anyway because of counsel's judgment that it was in defendant's best interests." (*Eddy*, at pp. 481-482, fns. omitted.)

*Eddy* does not control the outcome of our case because, unlike *Eddy*, there is nothing in the record to establish defense counsel knew Palmer objected to a concession strategy or that Palmer ever instructed his counsel not to pursue such a tactic. Instead, during the *Marsden* hearing *after* the jury returned a guilty verdict, Palmer argued he had "nothing to hide" and wanted to "take full responsibility for what [he'd] done." However, in so informing the court, he also admitted that he had lied to his attorney as well as law enforcement about what had happened. In absence of a record showing that Palmer objected to his defense counsel's strategy to concede he committed manslaughter *before* she did so in closing argument, no basis exists under *McCoy* or *Eddy* upon which to find any constitutional violation.

In summary, Palmer presented multiple explanations to his attorney about what happened on the night in question. There is no indication that he told his trial counsel

20

that he wanted to assert his innocence.  There is no hint in the record that he disagreed with a concession strategy.  Instead, it appears that Palmer consistently changed his story, presenting a moving target for his attorney to follow, and, it is clear, that the defense counsel presented the best defense possible under the dire circumstances presented.  This is not a case where Palmer's attorney ignored his request to present an innocence defense.  Accordingly, Palmer was not denied his constitutional rights to effective assistance of counsel, jury trial, confrontation, and against self-incrimination because the record does not demonstrate he objected in any manner to counsel's concession of guilt until after the jury returned a guilty verdict.  (See *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1167 ["Absent a contrary directive or timely objection from the client, conceding guilt on the charges for which there was overwhelming evidence would be a reasonable strategy to garner credibility and cultivate a more favorable environment for the jury's consideration of defense arguments regarding the charges that *were* reasonably in dispute."].)

## II

## CUSTODY CREDITS

Finally, as Palmer points out, and the People concede, the probation officer's report inadvertently began the credit calculation on April 18, 2016, and not April 8, 2016, the actual date of arrest.  Based on that calculation, the court awarded Palmer 796 days of actual credits.  We therefore remand this matter back to the superior court; so, the court can correct the number of actual days of credit to 806.  (See *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1205.)

21

DISPOSITION

The matter is remanded to the superior court to amend the abstract of judgment to indicate the correct presentence custody credits. The court shall forward the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

22