22CA1634 Peo v Moench 10-16-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1634
Jefferson County District Court No. 14CR1764
Honorable Christopher C. Zenisek, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Gordon Lee Moench,

Defendant-Appellant.

---

ORDER AND SENTENCE AFFIRMED

Division I
Opinion by JUDGE J. JONES
Grove and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 16, 2025

---

Philip J. Weiser, Attorney General, Brian M. Lanni, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jason C. Middleton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Gordon Lee Moench, appeals the postconviction court's order denying his Crim. P. 35(c) motion without a hearing. He also appeals the restitution portion of his sentence. We affirm.

## I.    Background

¶ 2    One summer evening, Moench called 911 to report "a guy out front [of his house] with a gun [who] is ready to kill a bunch of people." The 911 dispatcher asked, "And you're inside the residence?" Moench replied, "Ah, no, I'm the guy with the gun." Moench told the dispatcher that he was standing on the back of his truck with three guns that were "enough to hurt a lot of people." The dispatcher asked, "Why would you wanna hurt someone?" Moench replied, "Good question. But I'll tell you what, you'll find out when you get here. Thanks." Moench also sent two text messages: one to his stepson telling him, "I'm coming to kill you," and another to his friend reading, "In a blaze of glory," with an attached image of three guns on top of his truck. He later testified at trial that he was trying to commit "suicide by cop."

¶ 3    Responding to the 911 calls, Lakewood Police Department Patrol Officer Jonathan Key drove his patrol SUV to Moench's house. Standing on his truck, Moench shot toward Officer Key's

1

SUV three times. Two shots went through the driver's side windshield. Those shots hit Officer Key in his arm and chest. Officer Key let out a shout, rolled out of his SUV, and called for help over the radio.

¶ 4 Agent Kimberly Collins approached Moench's house from the direction opposite that of Officer Key. After hearing from the dispatcher and bystanders that a police officer had been shot, she walked toward the house with her flashlight raised. Moench, still standing on top of his truck, shot Agent Collins in the leg just below her knee. She lost consciousness from loss of blood.

¶ 5 Agent Luke Godfrey, aware that two of his colleagues had already been shot, drove to Moench's house. Once he arrived, Moench picked up a different gun, got off his truck, and walked into the street. Agent Godfrey saw Moench approaching with a gun and ordered him to stop and drop the weapon. Moench began to raise the gun toward Agent Godfrey. Agent Godfrey shot and incapacitated Moench.

¶ 6 Both Officer Key and Agent Collins survived the shootings but suffered life-threatening injuries.

¶ 7      The People charged Moench with two counts of attempted first degree murder after deliberation, two counts of attempted first degree extreme indifference murder, and one count each of attempted first degree assault and extreme indifference assault.

¶ 8      Moench initially pleaded not guilty by reason of insanity.  *See* § 16-8-103(1.5), C.R.S. 2025.  At defense counsel's request, the district court ordered an in-custody evaluation of Moench's competency and sanity.  The evaluator concluded that Moench had the capacity to form the mental state required for the charges and that he was capable of understanding the nature of the proceedings against him and assisting in his defense.

¶ 9      Moench's theory of defense at trial was that, when he shot the officers, he didn't have the requisite mental state to be found guilty beyond a reasonable doubt.  A jury found him guilty as charged. The court sentenced him to 120 years in the custody of the Colorado Department of Corrections.

¶ 10     A division of this court affirmed the judgment of conviction on direct appeal.  *People v. Moench*, (Colo. App. No. 16CA1300, Sept. 26, 2019) (not published pursuant to C.A.R. 35(e)).

¶ 11     Moench, proceeding pro se, timely filed a Crim. P. 35(c) motion for postconviction relief.  In his motion, he alleged that his convictions should be vacated because his trial counsel had provided ineffective assistance.  The postconviction court appointed counsel, who later supplemented Moench's motion.  After reviewing the motion and supplement, the postconviction court denied the motion without holding an evidentiary hearing.

## II.     Ineffective Assistance of Counsel

¶ 12     Moench contends that he was entitled to a hearing on his ineffective assistance of counsel claims that his trial counsel (1) didn't adequately prepare him to testify in his defense (Claim 5) or give him adequate access to discovery (Claim 1); and (2) failed to "investigate, develop, and present relevant medical and mental condition" evidence (Claims 2, 3, and 7).  We reject each of these contentions.

### A.     Applicable Law and Standard of Review

¶ 13     When reviewing ineffective assistance of trial counsel claims, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003); *People v. Long*, 126 P.3d 284, 286 (Colo. App. 2005).  To

prevail on such a claim, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. *Strickland*, 466 U.S. at 686.

¶ 14 To establish deficient performance, a defendant must prove that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

¶ 15 To establish prejudice, a defendant must show that there is a reasonable probability that, absent the deficient performance, "the result of the proceeding would have been different." *Id.* at 694.

¶ 16 Because a defendant must ultimately prove both deficient representation and resulting prejudice, a postconviction court may deny a Crim. P. 35(c) motion if either *Strickland* prong isn't satisfied. *Ardolino*, 69 P.3d at 77. The court may summarily deny the motion "if the claims raise only an issue of law, or if the allegations, even if true, do not provide a basis for relief," or "if the

claims are bare and conclusory in nature, and lack supporting factual allegations." *People v. Venzor*, 121 P.3d 260, 262 (Colo. App. 2005). And the court may deny the motion without a hearing if the record refutes the claims. *People v. Duran*, 2015 COA 141, ¶ 9.

¶ 17 We review de novo a district court's denial of a Crim. P. 35(c) motion without a hearing. *People v. Davis*, 2012 COA 14, ¶ 6.

### B. Testimony Preparation and Discovery Access

¶ 18 Moench contends that his attorney provided ineffective assistance by failing to adequately prepare him to testify (Claim 5). He also contends that his attorney didn't give him sufficient access to discovery in his case (Claim 1). The court correctly denied these claims without a hearing.

### 1. Testimony Preparation

¶ 19 Moench argues that his counsel didn't adequately prepare him to present key information to the jury, so when he testified, he didn't clearly explain those facts to the jury. More specifically, he claims that he wasn't prepared to explain why his alleged actions showed a lack of intent. He argues that, with proper preparation, he would have told the jury that (1) he couldn't see the agents

6

clearly on the night of the incident; and (2) he took measures to prevent injury to others (for example, he had previously told an interviewing officer that he deliberately aimed his gun high and to the left of the two agents). And he argues that his counsel's performance was deficient because competent counsel would have elicited such testimony on direct examination.

¶ 20 Moench's claim fails as a matter of law for two reasons.

¶ 21 First, the "facts" at issue — what Moench did on the night of the incident and what he had told an officer at the hospital — were facts of which he was always obviously aware, and he doesn't claim otherwise. To the extent he failed to adequately explain these "facts" to the jury under questioning (discussed below), that falls on him.

¶ 22 Second, the record shows that Moench had ample opportunity to present these facts to the jury, including in response to his attorney's questions.

¶ 23 As for Moench's alleged inability to see clearly, his attorney asked him whether the view of the scene at night differed from the photographs of the scene taken during the day. Moench said it did. Moench also testified on direct examination that Officer Key's SUV's

headlights weren't on and that he subsequently saw Agent Collins walking towards him holding a flashlight. On this testimony alone, the jury could have deduced that it was dark at the time.

¶ 24  In response to questions on cross-examination, Moench said that the darkness affected his actions during the shootings and that he couldn't see the officers well because of it. He agreed with the prosecutor that he fired at one officer from "[a] hundred yards away under the cover of darkness."

¶ 25  Jurors, too, asked Moench questions relating to visibility. A juror asked, "Were there any lights on your residence, or overhead street lamps illuminating[,] . . . or [were] you completely in the dark?" Moench replied, "The porch light was on in front of the house, as was the door was opened, screen door was cracked open so the inside lights were on, also." And other witnesses, including the police officers, testified that it was "extremely dark" at the time of the shootings.

¶ 26  With respect to his actions showing lack of intent, Moench's attorney asked him on redirect whether he meant to hurt the two agents. He said he didn't. On direct examination, when defense counsel asked what happened after his first shot at Officer Key,

Moench said he thought he missed Officer Key's vehicle. And, while counsel didn't specifically ask Moench whether he had intentionally aimed high and to the left when he shot toward the two officers, Moench's counsel gave Moench an opportunity to clarify that exact point when counsel asked him whether he had fired in Officer Key's direction and what was going through his mind when he fired toward Agent Collins. And counsel asked Moench if he was surprised when he shot Agent Collins. Moench said that he was and that he was just trying to draw fire.

¶ 27    On cross-examination, Moench said, "That [shooting two people] was never an intent. I would not intentionally shoot two people." Additionally, a juror asked Moench, "Why did you shoot at the police instead of in the air or somewhere you knew would not have any chance of hitting them?" Moench replied, "That's a question I ask myself a lot. And, you know, I made a lot of bad decisions that night. And that was one of the big ones." A juror also asked, "Why fire through the windshield instead of the hood or tires if all you wanted to do was bring more officers to the area?" Moench replied, "There wasn't aiming, it was just in the direction of the police officers. It wasn't trying, per se, to hit the engine . . . ."

¶ 28    At any point during this questioning, Moench could have drawn on his own memory to answer differently or with more explanation. None of the questions at issue could have come as a surprise to Moench, and he cites no authority for the proposition that his attorney was somehow required to script his answers for him.[1]

¶ 29    We therefore conclude that the record refutes this claim of deficient performance. And to the extent counsel performed deficiently by failing to ask these questions himself, there was no prejudice because the questions were asked by others, and Moench had every opportunity to explain his actions.

### 2.    Discovery Access

¶ 30    Moench contends that trial counsel's decision to limit his access to discovery put him at a disadvantage in preparing to testify (Claim 1). Specifically, he argues that he should have had access to

---

[1] Indeed, to the extent Moench argues that his attorney should have coached him to answer all of these questions differently than he did while under oath, he comes perilously close to arguing that counsel should have coached him to answer questions less than truthfully, which an attorney obviously can't do. *See* Colo. RPC 3.4(b) ("A lawyer shall not . . . counsel or assist a witness to testify falsely . . . .").

discovery because it would have refreshed his memory that he told an officer at the hospital that he had aimed high and to the left of Officer Key and Agent Collins. This claim also fails as a matter of law.

¶ 31    A criminal defendant doesn't have "an unqualified right to review personally all discovery materials." *People v. Krueger*, 2012 COA 80, ¶ 16. Indeed, courts have recognized that there may be good reasons for counsel *not* to allow a defendant unfettered access to discovery. *Id.* at ¶ 17. Similarly, what defense to present is a matter of strategy that defense counsel has the authority to determine. *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018); *People v. Gallegos*, 2025 CO 41M, ¶ 27; *see Arko v. People*, 183 P.3d 555, 558 (Colo. 2008). "[A] defendant must show that, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance." *People v. Wilson*, 397 P.3d 1090, 1097 (Colo. App. 2011), *aff'd*, 2015 CO 37.

¶ 32    Moench didn't allege facts that, if proved, would show that his attorney's alleged decision to limit his access to certain discovery materials (or failure to consider whether he should see these

11

materials) was objectively unreasonable. Rather, his claim was conclusory. Indeed, on appeal, he relegates the issue to a mere footnote, thereby failing to adequately develop the argument. *See People v. Wallin*, 167 P.3d 183, 187 (Colo. App. 2007) (declining to address issues presented in a perfunctory or conclusory manner). But, in any event, what Moench had previously told an investigating officer about where he had aimed — the only factual matter alluded to in this claim — was, as previously noted, something of which he obviously had personal knowledge.

## C. Medical and Mental Evidence Investigation

¶ 33 Moench also contends that his attorney provided ineffective assistance by failing to investigate and present a medical or mental condition defense (Claims 2, 3, and 7). He says presenting such a defense would have undermined the People's attempt to prove that he possessed the mens rea — knowingly — necessary to convict him of attempted murder and attempted first degree assault. He specifically asserts that his counsel should have (1) obtained a second, privately retained medical and psychological evaluation; (2) investigated and developed evidence of his claimed lactic

acidosis[2] and possible diabetic ketoacidosis[3] because those conditions can cause "confusion"; and (3) investigated how psychiatric side effects of Celexa, an antidepressant medication he had been taking at the time of the shootings, could have altered his mental state and behavior.

¶ 34    We conclude that the record lacks any significant support for any of these contentions.  And, regardless, Moench failed to allege facts showing that any decision to forgo such an approach to the defense was anything other than legitimate trial strategy.

1.    Additional Background

¶ 35    Moench, who is diabetic, testified that, the day before the shootings, he tried to kill himself by overdosing on insulin.  He had

---

[2] Lactic acidosis is a medical condition that occurs when there is a buildup of lactic acid in the body's bloodstream.  Cleveland Clinic, *Lactic Acidosis* (June 13, 2023), https://perma.cc/D398-UPPA.  Symptoms of lactic acidosis may include nausea, vomiting, exhaustion, fatigue, respiratory compensation, and muscle cramps.  *Id.*  As relevant to this appeal, advanced symptoms may include delirium and confusion.  *See id.*

[3] Diabetic ketoacidosis is a medical condition that affects people with diabetes who have high blood sugar and ketone levels.  Mayo Clinic, *Diabetic Ketoacidosis* (July 25, 2025), https://perma.cc/YJ74-PWAP.  Symptoms may include belly pain, weakness/tiredness, shortness of breath, frequent urination, and, as relevant on appeal, confusion.  *See id.*

recently lost his job and had experienced frequent disagreements with his wife and stepson. He still maintained a life insurance policy from his former employer and wanted to ensure that his wife received money from that policy after he died. Moench went inside a camper that he owned, which was in his driveway. Alone, he injected large quantities of insulin and fell asleep. Moench woke up around 4 a.m. on the day of the shootings. He checked his insulin level; "[i]t was seventy-two." He then went to his bedroom, where his wife was, and told her he had almost died. His wife said at trial that "[h]e seemed melancholy," but she "wasn't concerned that he was in a crisis."

¶ 36    Later, after Agent Godfrey shot him, Moench was taken to the hospital. After he was treated, Lakewood Police Detective Bryan Feik interviewed him at the hospital. Detective Feik asked him how he felt when he woke up in bed on the day of the shootings after taking large quantities of insulin. Moench said he felt "very loose." Later, Moench said he hadn't felt cranky or high from the effects when he was arguing with his wife and stepson later that day.

¶ 37    Detective Feik asked if he was still feeling any effects of the insulin overdose at the time of the shootings. Moench said he

14

wasn't. He elaborated that the weakness from high insulin can stick around for twenty-four hours. He said, "My blood sugar is high and you know, um, I'm attributing that to some cookies I ate and all of the stress involved. Stress does create higher blood sugar too, so . . . ." Detective Feik asked, "The reason I asked about the blood sugar is . . . where I'm getting at is I'm wondering if in your opinion if that contributed to the reason why we're here." Moench replied, "I personally do not think the blood sugar did . . . ."

¶ 38 Detective Feik asked Moench if he usually took his medications as prescribed. Moench said he sometimes forgot to take his medications but usually got "massive heartburn" to remind him that he forgot. He said he took his medications five to six times per week. Detective Feik asked whether taking or not taking his medications, including Celexa, could affect his behavior and decision-making. Moench said, "Normally it's just the heartburn," but "[i]f I miss [Celexa] two days in a row, it's bad news." But Moench didn't mention that he was experiencing heartburn or other side effects from his medications on the day of the offenses, nor did he say that he missed taking his medications on or around the day of the offenses.

¶ 39   The in-custody evaluation of Moench's sanity and competence, which Moench's counsel requested, also shed light on his conditions. Dr. John DeQuardo with the Colorado Mental Health Hospital in Pueblo performed the evaluation and compiled a report. In his report, Dr. DeQuardo concluded the following:

- "[Moench's] glucose control, although suboptimal, was adequate, and he presented no symptoms suggestive of delirium or other acute somatic medical problem that contributed to his mood disturbance at any time in his past, including at the time of the index offense."

- "Concerning Mr. Moench's mental state at the time of the index offense, I do not believe that there is evidence that he suffered from any statutorily defined mental illness, disease or defect."

- "Mr. Moench did have symptoms of major depression at the time of the index offense, in my opinion; however, these were not associated with psychotic symptoms and did not interfere in any significant way with Mr. Moench's ability to understand his circumstances, or alter his behavior . . . ."

- "Mr. Moench clearly demonstrated his ability to deliberate based on his behavior during and around the index offense. He clearly described his thinking, behavior and intent to myself, as well as several other interviewers."

- "I do not believe that there is any significant evidence to suggest that Mr. Moench could not form the culpable mental state necessary for the crimes charged."

- "I do not believe that there is any evidence that Mr. Moench was suffering from a statutorily-defined mental disease or defect, nor did he have the inability to form the culpable mental state necessary for the crime charged, or to know that his behavior was wrong at the time of the index offense."

¶ 40    As a result of the report, Moench's counsel chose to forgo a not guilty by reason of insanity defense. Dr. DeQuardo didn't testify at Moench's trial.

## 2.    Second Evaluation

¶ 41    The record shows that Moench's counsel's decision not to seek a second, privately retained medical and psychological evaluation

17

(Claim 3) wasn't deficient performance. Dr. DeQuardo's report included significant detail about interviews he and others had with Moench. Dr. DeQuardo also reviewed Moench's past psychiatric and medical history prior to the shootings. Dr. DeQuardo was aware of Moench's medical conditions, including diabetes, hypertension, and head trauma (from motorcycle falls), and that he was taking insulin and Celexa, among other medications. He was also aware that Moench was suffering from significant depression, with symptoms including sleep disturbance, diminished energy, diminished hedonic capacity, suicidal ideation, and suicide attempts. After reviewing all of this information, Dr. DeQuardo concluded that Moench didn't "have the inability to form the culpable mental state necessary for the crime charged."

¶ 42  Moench failed to allege any facts that, if proved, would show that choosing to rely on Dr. DeQuardo's detailed report fell outside the range of professionally competent assistance. *See Wilson,* 397 P.3d at 1097. He failed to allege any *facts* casting doubt on Dr. DeQuardo's conclusions and failed to identify any potential expert who would have done so; this claim was, as the postconviction court ruled, conclusory. Indeed, he alleged only that, "[h]ad an

18

evaluation done by a nonbiased/private evaluator" who had reviewed his "medical records," "it would have changed the outcome of my trial."

### 3. Lactic Acidosis and Diabetic Ketoacidosis

¶ 43 There is no record support for Moench's contention that his trial counsel should have investigated or developed evidence of potential lactic acidosis or possible diabetic ketoacidosis (Claim 2).[4]

¶ 44 First, Moench's statements and his wife's testimony indicated that he felt and appeared fine at the time of the shootings. Moench told Detective Feik that he had felt fine and that his diabetes hadn't

---

[4] Moench questions whether evidence of his insulin levels could have given rise to a voluntary intoxication defense. *See People v. Garcia*, 113 P.3d 775, 777 (Colo. 2005) ("[T]he medical condition of insulin-induced hypoglycemia may, depending upon the particular facts and circumstances, constitute the affirmative defense of involuntary intoxication."). But the record doesn't support a finding that, at the time of the offense, he was intoxicated at all because Dr. DeQuardo confirmed that Moench's "glucose control, although suboptimal, was adequate, and he presented no symptoms suggestive of delirium or other acute somatic medical problem that contributed to his mood disturbance at any time in his past, including at the time of the index offense." Moreover, while a defendant may request an involuntary intoxication defense when he's intentionally ingested an amount of substances he believed he could consume, the facts in this case show that Moench intentionally attempted to *overdose* on insulin, so an involuntary intoxication defense wouldn't have been viable. *See People v. Turner*, 680 P.2d 1290, 1291-93 (Colo. App. 1983).

affected his behavior on the night in question. Moench said he didn't feel any effects of the insulin overdose at the time of the shootings. He also said that his blood sugar was high because of the cookies that he had eaten, combined with stress. And he said that he "personally [didn't] think the blood sugar" contributed to his actions during the shootings. As well, after Moench went back to his bedroom the morning before the shootings and told his wife that he almost died after taking large quantities of insulin, his wife, who is a nurse, wasn't concerned about Moench's demeanor.

¶ 45     Second, though hospital records showed that Moench had a higher-than-normal insulin level at the hospital, those records attributed that measurement to the intravenous fluid dye given to Moench after the shootings and the shock he was experiencing. Moench alleged no facts suggesting otherwise.

¶ 46     Third, Dr. DeQuardo's report indicated that "no symptoms suggest . . . delirium . . . that contributed to [Moench's] mental state." He reached this conclusion with full knowledge of both Moench's deliberate insulin overdose and the cookies he ate the following day.

¶ 47 In sum, the evidence in the record refutes Moench's postconviction claim that his mental condition was impaired at the time of the shootings. His motion implying otherwise offered nothing but conclusory assertions.

¶ 48 We also observe that, had counsel chosen to raise Moench's medical condition, the prosecution likely would have called Dr. DeQuardo as a witness to testify that Moench wasn't affected by those conditions on the day of the offenses, that Moench had the "ability to deliberate based on his behavior during and around the index offense," and that Moench could have "form[ed] the culpable mental state necessary for the crime charged." And, of course, there were his own statements to police and his wife's testimony, which also would have undermined this defense.

4. Celexa Side Effects

¶ 49 The record refutes Moench's assertion that he may have been affected by Celexa's potential psychiatric side effects on the day of the offenses. When Moench told Detective Feik that he occasionally missed a day taking his prescribed medications, including Celexa, he said it was only noticeable when he forgot for two days or more. In that interview, Moench never suggested that Celexa's potential

21

side effects were the reason for his behavior during the shootings. And Dr. DeQuardo didn't "believe that there [wa]s evidence that [Moench] suffered from any statutorily defined mental illness, disease or defect" at the time of the shootings. He also concluded, "Mr. Moench did have symptoms of major depression at the time of the index offense, in my opinion; however, these were not associated with psychotic symptoms and did not interfere in any significant way with Mr. Moench's ability to understand his circumstances, or alter his behavior . . . ." Again, Moench's motion failed to allege *facts* that, if proved, would contradict this record evidence.

## III. Restitution Order

¶ 50 For the first time on appeal, Moench contends that the district court lacked authority to enter a restitution order, and therefore, his sentence was illegal.

¶ 51 We review the legality of a sentence de novo. *Snow v. People*, 2025 CO 32, ¶ 23.

¶ 52 A defendant may challenge his sentence under Crim. P. 35(a) as either an illegal sentence claim or an illegal manner claim. *Tennyson v. People*, 2025 CO 31, ¶ 24. This is an important

22

distinction "because an illegal manner claim is subject to a time limitation, but an illegal sentence claim is not." *Id.* at ¶ 30.

¶ 53    A sentence is illegal if it "is not authorized by law because it fails to comply *in full* with statutory requirements." *Id.* at ¶ 25; *see, e.g.*, *Downing v. People*, 895 P.2d 1046, 1049-50 (Colo. 1995) (resentencing to a longer term than originally imposed in violation of a statutory prohibition is illegal); *People v. White*, 179 P.3d 58, 60-61 (Colo. App. 2007) (a sentence imposed to be served concurrently, when the General Assembly required it be imposed to be served consecutively with another sentence, is illegal).

¶ 54    "A sentence is imposed in an illegal manner 'when the trial court ignores essential procedural rights or statutory considerations in forming the sentence.'" *Tennyson*, ¶ 29 (quoting 15 Robert J. Dieter, *Colorado Practice Series: Criminal Practice and Procedure* § 21.10 n.10 (2d ed. 2004)); *see, e.g.*, *People v. Sisson*, 179 P.3d 193, 196 (Colo. App. 2007) (a claim of denial of procedural due process is an illegal manner claim).

¶ 55    As part of its sentencing prerogative, the "General Assembly has long required that every criminal sentence reflect consideration of restitution." *Tennyson*, ¶ 20.  A restitution order under section

18-1.3-603(1)(b), C.R.S. 2025, "allows a trial court, at or before sentencing, 'to merely order that the defendant be obligated to pay restitution and postpone a determination of the specific amount of restitution.'" *Id.* at ¶ 41 (quoting *Sanoff v. People*, 187 P.3d 576, 578 (Colo. 2008)). Accordingly, a "defendant's judgment of conviction becomes final and appealable when the court enters an order making the defendant liable to pay restitution, even though the amount of restitution hasn't been (and won't be) determined until sometime after the sentencing hearing." *Id.* (citing *Sanoff*, 187 P.3d at 578-79).

¶ 56 Because the *amount* of restitution "has been severed from the meaning of the term 'sentence,' . . . an order for a specific amount of restitution is itself an appealable order," "[a]s a separate, final judgment." *Sanoff*, 187 P.3d at 578. Accordingly, a claim, "which challenges the timeliness of the determination of the *amount* of restitution, is an illegal manner claim, not an illegal sentence claim." *Tennyson*, ¶ 45 (emphasis added).

¶ 57 *Snow*, on which Moench relies, doesn't support his contention. In *Snow*, the prosecution asked the district court to "reserve restitution" for sixty days, and the district court granted its request.

24

*Snow*, ¶ 7.  The prosecution filed a motion for restitution, and the district court entered a post-sentencing restitution order granting the prosecution's motion 108 days after the sentencing hearing.  *Id.* at ¶ 8.  The supreme court held that sentence was illegal because "the court's order at sentencing related to restitution did not satisfy the restitution component of Snow's sentence and judgment of conviction."  *Id.* at ¶ 22 (citing *Meza v. People*, 2018 CO 23, ¶¶ 13-14).  And because restitution is a component of every sentence, and the district court didn't enter any of the orders authorized by section 18-1.3-603(1), the illegal sentence remained correctable at any time.  *Id.* at ¶¶ 23-24.

¶ 58     By contrast, the court in this case indicated that it would reserve determining the restitution amount because the necessary information wasn't yet available.  The prosecutor told the court that "[s]ome of the [restitution] figures are yet to be determined" and asked "that the defendant be ordered to pay restitution and that the amount be determined within 91 days."  Defense counsel said he had reached out to the prosecution "to check about the restitution," and "[i]t sounds like there's not a figure yet."  And defense counsel also said the defense had asked if certain of Moench's property

25

could be released to law enforcement "so that they could auction that and defray some of the expenses in this case." The prosecutor's statements and defense counsel's responses indicated that the only possible dispute was over the amount of restitution; whether restitution should be ordered wasn't contested. Thus, when the court later said the prosecution would "have 91 days to file their motion for restitution," we read that statement as ordering restitution but allowing the prosecution time, as requested, to present a specific amount. *See* § 18-1.3-603(1)(b), C.R.S. 2015. Therefore, unlike in *Snow*, the district court in this case granted the prosecution's request for restitution and left only the amount of restitution to be determined later. *Compare Snow*, ¶¶ 6-7, 27; *with Sanoff*, 187 P.3d 577 ("As authorized by the applicable statutory provision, the court reserved ruling on the specific amount of restitution . . . ." (footnote omitted)).

¶ 59    To the extent Moench challenges the timing of the court's determination of the *amount* of restitution, that challenge is a time-barred illegal manner claim. *See Tennyson*, ¶ 45.

## IV.    Abandoned Claims

¶ 60    We deem abandoned any Crim. P. 35(c) claims Moench raised in his postconviction motion but hasn't reasserted on appeal.  *See People v. Osorio*, 170 P.3d 796, 801 (Colo. App. 2007).

## V.    Disposition

¶ 61    We affirm the order and sentence.

JUDGE GROVE and JUDGE SCHUTZ concur.